1  Mark L. Javitch
   *mark@javitchlawoffice.com*
2  **JAVITCH LAW OFFICE**
   3 East 3rd Ave. Ste. 200
3  San Mateo CA 94401
   (650) 781-8000 telephone
4  (650) 648-0705 facsimile

5  Thomas A. Zimmerman, Jr. (admitted *pro hac vice*)
   *tom@attorneyzim.com*
6  Sharon A. Harris (admitted *pro hac vice*)
   *sharon@attorneyzim.com*
7  **ZIMMERMAN LAW OFFICES, P.C.**
   77 W. Washington Street, Suite 1220
8  Chicago, Illinois 60602
   (312) 440-0020 telephone
9  (312) 440-4180 facsimile
   www.attorneyzim.com
10 *firm@attorneyzim.com*

11
   Attorneys for Plaintiff and all others similarly situated
12

13                 UNITED STATES DISTRICT COURT

14     NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

15

16 SHAWN LYNCH, on behalf of himself and    )  **Case No. 22 CV 03704-WHA**
   all other persons similarly situated,    )
17                                          )
                                            )  **SECOND AMENDED CLASS ACTION**
18         Plaintiff,                       )  **COMPLAINT FOR DAMAGES,**
                                            )  **RESTITUTION AND**
19         v.                               )  **INJUNCTIVE/DECLARATORY RELIEF**
                                            )
20 MATTERPORT, INC., a Delaware             )
   corporation; RJ PITTMAN, DAVE            )  1. **VIOLATIONS OF CALIFORNIA'S**
21 GAUSEBECK, MATT BELL, CARLOS             )     **SELLER-ASSISTED MARKETING**
   KOKRON, PETER HEBERT, JASON              )     **PLAN ACT [Cal. Civil Code §§**
22 KRIKORIAN, and MIKE GUSTAFSON,           )     **1812.200*, et seq.**];
                                            )  2. **VIOLATIONS OF CALIFORNIA'S**
23         Defendants.                      )     **UNFAIR COMPETITION LAW**
                                            )     **("UCL") [Cal. Business & Professions**
24                                          )     **Code §§ 17200-17208, *et seq*.];**
                                            )  3. **VIOLATIONS OF CALIFORNIA'S**
25                                          )     **FALSE ADVERTISING LAW ("FAL")**
                                            )     **[Cal. Business & Professions Code §§**
26                                          )     **17500, *et seq*.];**
                                            )
27                                          )
                                            )
28                                          )

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

)   **4.  BREACH OF THE IMPLIED**
)   **COVENANT OF GOOD FAITH AND**
)   **FAIR DEALING.**
)
)   **DEMAND FOR JURY TRIAL**
)
)

Plaintiff **SHAWN LYNCH**, on behalf of himself and all others similarly situated ("Plaintiff"), hereby complains and alleges as follows based on investigation, information, and belief:

<u>**INTRODUCTION**</u>

1.    This class action lawsuit involves the false enticement of a lucrative business opportunity presented by MATTERPORT, INC, a Delaware corporation, ("Matterport"), along with its business directors, RJ PITTMAN, DAVE GAUSEBECK, MATT BELL, CARLOS KOKRON, PETER HEBERT, JASON KRIKORIAN, and MIKE GUSTAFSON, (collectively, "Defendants") who each engage in the advertising and sale of "seller assisted marketing plans," also referred to under certain state laws as "business opportunities," relating to the sale of Matterport 3D cameras and associated services.

2.    Defendants market and sell 3D cameras that create 3D models of real-world places. Supporting these 3D cameras, as part of a proprietary system, Defendants also offer software as a service ("SaaS"), such as software for three-dimensional image manipulation and Cloud storage. Defendants sell 3D cameras with the tied SaaS and advertise the lucrative business opportunity associated with the allegedly burgeoning industry of 3D scanning services.

3.    Matterport's 3D cameras save files (scanned images) in a format that is unreadable and needs to be processed into an immersive 3D model. Thus, the 3D camera buyer must also purchase SaaS from Matterport. Matterport's 3D camera and supporting SaaS constitute a "closed system," meaning that all of it is proprietary. Every scan done by Matterport's 3D cameras requires Matterport's proprietary software, technical support, maintenance, and server-space services provided only by Matterport.

4.    Thus, in addition to the sale of the 3D camera itself, a photographer must purchase a Cloud Service Plan[1] with Matterport to upload, process, and store the 3D scans.

5.    If Plaintiff and Class members do not pay the subscription fee for Matterport's Cloud Service Plan, the 3D camera equipment they purchased is rendered entirely useless, as it

---

[1] Matterport's Cloud Service Plan is also known as Cloud Services, Cloud Hosting, Hosting Plan, Hosting Services, or Software as a Service ("SaaS").

cannot be used without the mandatory "tied" services, software, and cloud storage that are included in Matterport's Cloud Service Plan. Plaintiff and Class members would also lose all access to the images they previously scanned and the 3D models they already created. Matterport would retain them, however.

6.    To induce purchasers and create demand for their 3D cameras and SaaS, Matterport advertised the Matterport Service Partner ("MSP") program as a "global network of immersive media professionals looking to build their own Matterport business." Defendants' sales representatives represent to potential buyers and the public that MSPs will receive marketing materials and pre-qualified or filtered leads in their geographic location that will pay for the initial investment in the Matterport 3D camera in a period of months. For example, Defendants promise "Pre-qualified local leads seeking 3D scanning services is a benefit of our MSP program. We match Matterport Service Partners on local proximity to leads who come in requesting a scan service. We've created the necessary resources and materials you need to sell MATTERPORT on your own and generate business too!"

7.    Defendants made numerous misrepresentations and omissions, which are detailed herein, to entice consumers to purchase Matterport 3D cameras and services and incur other out-of-pocket expenses in order to join the MSP program and "build their own Matterport business." Had Plaintiff not been misled by Defendants' misrepresentations and omissions as detailed herein, he would not have pursued his own MSP business and incurred out-of-pocket expenses, such as purchasing a Matterport 3D camera, purchasing a Matterport subscription to Matterport's Cloud services, and other expenses to start and operate his own MSP business.

8.    Furthermore, while Defendants have engaged in business as sellers of assisted marketing plans for several years, at no time did Defendants comply with the statutory requirements of California Civil Code sections 1812.200, *et seq.*, known as the Seller Assisted Marketing Plan Act ("SAMP Act").

9.    Plaintiff, on behalf of himself and the Class defined below, brings this action pursuant to California's SAMP Act, California's Unfair Competition Law ("UCL"), Business & Professions Code sections 17200, *et seq.*, California's False Advertising Law ("FAL"), Business

1    & Professions Code sections 17500, *et seq*., and the Implied Covenant of Good Faith and Fair

2    Dealing to obtain remedies for Defendants' unlawful, fraudulent, and unfair conduct in failing to

3    comply with regulations governing sales of opportunities, and making misrepresentations and

4    omitting material facts to Plaintiff and Class members concerning the business opportunity of 3D

5    cameras and services and that Matterport would be competing with Plaintiff and Class members.

6    Plaintiff also seeks injunctive relief to, *inter alia*, enjoin Matterport from continuing to operate its

7    Capture Services program and compete with Plaintiff and Class members.

8        10.    Defendants never provided required disclosures, did not comply with registration

9    requirements, engaged in deceptive, unlawful, and unfair trade practices, did not honor any

10   geographic limitations, saturated ill-defined and non-lucrative markets, and competed with Plaintiff

11   and Class members by selling cameras and offering Matterport Capture Services to Plaintiff's and

12   Class members' prospective leads and existing customers.

13       11.    In San Francisco in July 2017, Matterport launched a pilot program known

14   internally as "lion." "Lion" was the precursor to the Capture Services program that was announced

15   in Spring 2020. After news about the pilot program got out, MSPs complained that Matterport

16   would be directly competing with them if the "lion" program continued. Matterport quickly

17   announced it was withdrawing the pilot program due to backlash from the MSPs.

18       12.    However, despite this conflict of interest, Matterport continued the "lion" program

19   surreptitiously while Matterport continued to enroll people into the MSP program, but Matterport

20   was not telling the prospective MSPs about it when Matterport was enrolling them into the MSP

21   program. Additionally, in or about February 2019, Matterport surveyed MSPs about what they

22   charged for their scanning services. On information, investigation, and belief, Matterport then

23   used that information to devise pricing for Matterport Capture Services to the detriment of MSPs,

24   so that Matterport could undercut MSPs' pricing and steal the MSPs' customers.

25       13.    Matterport Capture Services was announced in Spring 2020. Matterport promotes

26   "Matterport Capture Services" on its website and states "Let us capture for you." *See*

27   https://matterport.com/capture-services. Matterport set the pricing for Matterport Capture Service

28   technicians' scans, and Matterport requires that a Capture Services customer purchase a

subscription plan—such as a Starter, Professional, or Business plan—or contact Matterport for custom enterprise plans. After Capture Services was announced, numerous MSPs complained that instead of helping them grow their business as Matterport promised, Matterport developed the Capture Services program and was competing against them. MSPs complained that Matterport was undercutting their prices to gain an advantage over MSPs, and MSPs lost customers who hired Matterport Capture Services technicians instead of the MSPs.

14.     As a result of Defendants' wrongful conduct, Plaintiff and Class members who pursued Matterport's business opportunity are entitled to actual and statutory damages, punitive damages, rescission, injunctive, and declaratory relief, plus reasonable attorney's fees and costs.

### JURISDICTION AND VENUE

15.     This matter was originally filed in the California Superior Court. Defendants removed this matter to federal court and asserted that it meets all the requirements of 28 U.S.C. section 1332(d)(2)(A). *See* Dkt. #1, Defendants' Notice of Removal.

16.     Venue is proper pursuant to 28 U.S.C. section 1391(b)(1) because Matterport resides in this District and all the Defendants reside in California. Venue is also proper pursuant to 28 U.S.C. section 1391(b)(2) because this is the District in which a substantial part of the events or omissions giving rise to the claim occurred. Matterport is located and is domiciled in this county and maintains offices and transacts business in this county. Further, the unlawful acts and business practices alleged herein are directed and controlled from Defendants' corporate headquarters located in Sunnyvale, California in Santa Clara County. Lastly, the contracts and terms of use governing the relationship between Plaintiff and Class members and Defendants provide for lawsuits to be commenced in courts located in Santa Clara County, California.

### THE PARTIES

#### *Plaintiff*

17.     At all times relevant, Shawn Lynch ("Lynch") was and is a natural person over the age of eighteen. During the relevant time frame, from 2018 to August 2021, Lynch resided in Washington, D.C., and in September 2021, Lynch moved to Reston, Virginia and currently resides there.

1

*Defendants*

2    18.    Matterport is a Delaware corporation with its headquarters and principal place of

3    business located at 352 E. Java Drive, Sunnyvale, California 94089. Matterport is engaged in

4    business throughout California and engages in soliciting contracts for seller assisted marketing plans

5    related to its 3D camera products and associated services through what is referred to by the company

6    as the MSP program.

7    19.    At all relevant times, RJ Pittman ("Pittman") was the Chief Executive Officer of

8    Matterport and is on the Board of Directors. Pittman is the principal executive officer, a director

9    of Matterport, and directly or indirectly controls Matterport.

10    20.    At all relevant times, Dave Gausebeck ("Gausebeck") was the Chief Technology

11    Officer of Matterport and on the Board of Directors. Gausebeck is a director of Matterport and

12    directly or indirectly controls Matterport.

13    21.    At all relevant times, Matt Bell ("Bell") was the co-founder, advisor, and a member

14    of the Board of Directors of Matterport. Bell directly or indirectly controls Matterport.

15    22.    At all relevant times, Carlos Kokron ("Kokron") was a member of the Board of

16    Directors of Matterport. Kokron directly or indirectly controls Matterport.

17    23.    At all relevant times, Peter Hebert ("Hebert") was a member of the Board of

18    Directors of Matterport. Hebert directly or indirectly controls Matterport.

19    24.    At all relevant times, Jason Krikorian ("Krikorian") was a member of the Board

20    of Directors of Matterport. Krikorian directly or indirectly controls Matterport.

21    25.    At all relevant times, Mike Gustafson ("Gustafson") was on the Board of Directors

22    of Matterport. Gustafson directly or indirectly controls Matterport.

23    26.    Plaintiff is informed and believes, and based thereon alleges, that each Defendant

24    acted in all respects pertinent to this action as the agent of and/or in concert with the other Defendants,

25    carried out a joint scheme, business plan, or policy in all respects pertinent hereto, and the acts of

26    each Defendant are legally attributable to the other Defendants. Plaintiff is informed and believes

27    that all Defendants are to be jointly and severally liable for the unlawful acts as described herein.

28    Further, Plaintiff is informed and believes, and based thereupon alleges, that Defendants, and each

1    of them, each had knowledge and information sufficient to them to have authorized, ratified, and

2    directed the acts of one another as their conduct relates to Defendants' uniform practices and

3    treatment of the proposed Class members.

4            27.    The role of Matterport's Board of Directors is to review and evaluate the strategies

5    and plans for the company, and in order to do that, the directors need to understand to some level

6    of detail the company's goals, objectives, and focus. The individual Defendants routinely

7    discussed Matterport sales and marketing programs and strategies, 3D camera and Cloud Services

8    revenue, sales goals, and forecasts, Matterport's partnerships and customer programs, and

9    evolving the company business model from hardware to a pure Cloud Services model, and they

10   reviewed presentations on those topics during the Board of Directors meetings. The topics of

11   some of the presentations to the directors included (a) Matterport marketing efforts, and sales

12   representatives' 3D camera sales data; (b) the company's organizational focus and entry into new

13   markets; and (c) leads.

14           28.    The Board of Directors discussed Matterport's business development progress and

15   vision, and plans for future expansion. Initially, Matterport's Board of Directors put pressure on

16   the sales team to meet revenue goals via 3D camera sales. The Board of Directors discussed the

17   launch of the MSP program, which was intended to grow 3D camera sales and, as time went on,

18   the growth of the MSP network. However, as time progressed, the directors discussed how the

19   MSP program is not scalable and does not generate much profit for Matterport, how the MSP

20   model conflicts with Matterport's interests, and evolving the company business model from

21   focusing on hardware sales to SaaS sales (*i.e.*, Capture Services).

22           29.    The directors discussed pilot programs that were the precursor to Matterport

23   Capture Services, and discussed the development of the Capture Services program.

24           30.    On information, investigation, and belief, the directors were aware of complaints

25   from MSPs about not getting any prequalified leads, MSPs not making their return on investment

26   within months, and Matterport competing against MSPs by selling cameras to MSPs' customers.

27   The directors were aware of complaints from MSPs that Matterport was competing against MSPs

28   for scanning services through the Capture Services program. Despite all of this, the directors (*i.e.*,

1   individual Defendants) deliberately continued to engage in the deceptive conduct complained of

2   herein.

3                                   **FACTUAL ALLEGATIONS**

4        31.    Matterport sells 3D cameras that create 3D models of real-world places, which

5   have many potential applications, including in connection with real estate sales. Matterport

6   advertises, promotes, and sells 3D cameras to the public. Through its advertisements, promotional

7   materials, in-person and telephonic solicitations, and websites, Matterport offers a business

8   opportunity to its 3D camera purchasers, including providing filtered leads and additional support

9   and services. Matterport refers to these 3D camera purchasers and these purchasers of its services

10  and support as "MSPs", or Matterport Service Partners. Matterport's website had "Program

11  Overview", "Benefits", "FAQs", and "Apply Today" webpages that were in use on Matterport's

12  website from the start of the MSP program on August 14, 2015 until Matterport stopped accepting

13  new applications into the MSP program on November 27, 2019.

14       32.    Matterport provided false statements on its website in connection with its 3D

15  camera sales. These misrepresentations were uniform, as they were listed on the MSP program

16  webpages on Matterport's website, in sales presentations given by Matterport sales

17  representatives, and on other Matterport marketing materials. Matterport's marketing team re-

18  used the same misrepresentations in its various marketing materials.

19       33.    Matterport gave its sales representatives written, uniform talking points and

20  flowcharts for all of the sales representatives to use when talking to prospective customers to sell

21  Matterport's products and services, including when touting the benefits of the MSP program, and

22  they would convey that standard text to prospective customers. These talking points included the

23  same misrepresentations on the MSP program webpages on Matterport's website and in

24  Matterport's various marketing materials.

25       34.    Matterport's inside sales representatives represent to potential buyers that MSPs

26  receive marketing materials and "filtered leads" in their geographic 3-30 mile location that would

27  pay for the initial investment in the Matterport 3D camera in "six months." On information,

28  investigation, and belief, the same misrepresentations were part of a standard script that was

communicated by Matterport to hundreds, if not thousands, of individual purchasers to induce

potential buyers to purchase a high-priced 3D camera and pay for associated support and services.

35.    Through Matterport's sales pitches, solicitations, advertisements, and promotional

materials, consumers are enticed to purchase a piece of equipment for which they have very little

personal use by the promise of a for-profit, cannot-lose business opportunity in what Defendants

claim is a nascent, but exponentially growing, industry.

36.    Matterport's website, formerly located at https://www.matterport.com/matterport-

service-partner-network/benefits, stated "YOUR BUSINESS, YOUR WAY" and "Be your own

boss, set your own hours, and earn what you want. For only $4,100* in up-front investment and

minimal training, you'll be on your way to a lucrative, self-owned business."

37.    Defendants' representations are false, deceptive, and likely to mislead a reasonable

consumer. Additionally, Defendants omitted material facts as more fully set forth below.

38.    Matterport saturated Plaintiff's and Class members' local areas with other

purchasers to whom Matterport also promised filtered leads, but Defendants failed to inform

Plaintiff or Class members of this material fact. As a result, Plaintiff has not been able to profit

as promised from Matterport's supposed "lucrative" business opportunity. Upon investigation,

information, and belief, this is also true for the members of the Class, defined below.

### *Misrepresentation #1*
### *The Matterport 3D camera is easy to use,*
### *and it is easy to learn and perform 3D scanning*

39.    Defendants made material misrepresentations in their marketing and promotional

activities that Matterport's 3D cameras, 3D scanning, and equipment are easy to use, when they

were not. For example, Matterport represented that "Matterport scanning is easy to learn in

minutes" and "easy for anyone to get started, fast."

40.    Sales representatives pitched Matterport's 3D cameras, 3D scanning, and

equipment to be as "easy as a toaster" to use.

41.    On June 23, 2016, an internal email sent to the Matterport sales team provided a

link to a webpage with a new video "emphasizing **how easy it is** to scan a room with Mattteport.

… It is a great resource for you to send to anyone who just doesn't get how dead simple it is to

Second Amended Class Action Complaint                                                22 CV 03704-WHA

use the Matterport Pro Camera. … We recommend this…as a follow-up when a lead brings up that the camera looks complicated to use."

42.    Matterport prepared Brand Guidelines, which were guidelines for all Matterport employees, so they use standard nomenclature when describing Matterport products and services to people outside of Matterport. In Brand Guidelines dated January 2016, it states: "**Nomenclature** *Given the technical nature of our brand, it is crucial that we establish consistent nomenclature around our products and experiences*." Further, the Brand Guidelines stated one of the descriptors for a "Matterport Pro Camera" is "Easy to use."

43.    In internal presentations given to Matterport sales representatives around approximately 2015 or 2016, the PowerPoint presentations included slides with talking points for the sales representatives, including the following:

- "What most people don't understand about this is that it's incredibly easy for anyone – no photography experience needed, no special skills, and it's really quick – you can do it yourself."

44.    The internal presentations also included pictures of toasters and stated: "It's unbelievably easy.

- It may look complex, but our camera does all the work, so it's actually as easy as operating an appliance.
- Like a toaster, it has one button and the system does the rest. If you have an admin at your brokerage who can operate a toaster, then you can do this.
- That admin, a listing assistant, can capture a listing in about an hour – no photographic skills, no technical capability."

### *Misrepresentation #2*
### *Matterport will provide the training materials MSPs need*
### *to learn to operate the 3D camera and perform 3D scans*

45.    Defendants' marketing materials and sales representatives' talking points stated that Matterport would provide MSPs with the training and launch materials they need to start their 3D scanning business—from exclusive tutorials to sales and marketing collateral—and that Matterport will make MSPs Matterport product experts with product training material and access

1  to Matterport's support helpline.

2         46.    Plaintiff and Class members detrimentally relied on Defendants' representations

3  that training and launch materials and substantive technical support would be provided, and had

4  Defendants disclosed the true facts about their nascent technical support "team" and the fact that

5  the business start-up costs would include hundreds of hours of time just to be able to use the

6  technology in order to be paid for scanner services, a reasonable person would have walked away

7  from Matterport's MSP program and camera and Cloud services purchases.

8         47.    Matterport developed ten "how to" videos for all Matterport customers regarding

9  the camera and scanning that were each about two minutes long on average. However, these

10  videos were not complete. Matterport did not have materials to teach an MSP how to competently

11  perform a 3D scan.

12         48.    Instead, MSPs and participants served as their own technical support and helped

13  each other learn to operate the 3D camera and perform scans. For example, MSPs started a

14  Matterport User Group page on Facebook where people could post their questions and other MSPs

15  could respond.

16
                            ***Misrepresentation #3***
17          ***The MSP program is a lucrative business opportunity***
         ***and MSPs will recoup their initial investment within a matter of months***

18         49.    At all relevant times, Matterport's marketing materials and sales representatives'

19  talking points touted the amount of money that a person could potentially earn as an MSP in a

20  matter of months, and they promoted the MSP program as a way to create a "lucrative, self-owned

21  business."

22         50.    For example, in an internal presentation given to Matterport sales representatives

23  about the benefits of the MSP program, Matterport provided the sales representatives with the

24  talking point that for a photographer, "[t]he Matterport camera typically pays for itself in 20 jobs,

25  in about 3 months."

26         51.    However, there are numerous complaints from MSPs that they were not making

27  any money, they were not able to recover a return on their investment, and it was not a lucrative

28  business opportunity.

52.    Matterport eventually acknowledged internally that they needed to revamp the MSP program messaging and eliminate the "quit your day job" messaging.

### *Misrepresentation #4*
### *Matterport will provide MSPs with pre-qualified local leads from businesses and individuals who are serious about purchasing 3D scanning services*

53.    Matterport made written misrepresentations such as "Pre-qualified local leads seeking 3D scanning services is a benefit of our MSP program. We match Matterport Service Partners on local proximity to leads who come in requesting a scan service."

54.    Additionally, Matterport sales representatives would tell people that if they became an MSP, Matterport would give them pre-qualified local leads from businesses and individuals who were serious about purchasing 3D scanning services. Free pre-qualified local leads were included in the sales representatives' talking points to tout the benefits of the MSP program.

55.    In internal presentations given to Matterport's marketing team in 2015/2016, Matterport promoted the "Vision 2016, fully automated lead-matching marketplace."

56.    Despite Matterport's promises, there were numerous complaints from MSPs that they were not getting leads, and other MSPs complained that when they did get leads, the leads were mostly other MSPs or other camera owners fishing for information, or someone asking for technical support.

57.    Matterport received emails from MSPs complaining about the leads they did get from Matterport. For example, one MSP stated that "I called the customer, but he is more interested in obtaining the camera I think. Most of the calls are in regards to info, not looking to hire. Basically, we are becoming a sales office for you guys at no cost to you."

58.    Internally, Matterport employees acknowledged that Matterport's sales team uses the MSP program as a sales tool, but after joining the program, the MSPs feel like they have been lied to when they get no leads.

59.    Matterport eventually acknowledged internally that they needed to revamp the MSP program messaging and eliminate any promises of leads.

***Misrepresentation #5***
***Matterport will provide the tools and resources***
***to ensure the success of the MSP's business***

60.     Matterport made misrepresentations about the tools and resources it would provide to MSPs to be successful in their MSP business. For example, Matterport stated "We've created the necessary resources and materials you need to sell Matterport on your own and generate business too!"

61.     The MSP "benefits" webpage on Matterport's website stated, "Connect with the resources you need to be successful. From initial onboarding to connecting with prospective clients, the Matterport Service Partner program provides powerful tools and resources to ensure the success of your business."

62.     Matterport misrepresented that it would provide MSPs with training and resources, but Matterport provided little to no technical support. Thus, in addition to the huge costs for 3D cameras, Cloud storage services, and business start-up costs, Matterport failed to disclose the amount of technical expertise necessary to actually perform viable and usable scans, and failed to disclose that Matterport's technical support team services nationwide were essentially in the hands of one or two people. The result was that MSPs, like Plaintiff, who relied on the need for technical support were denied such access and relegated to actually serving as a peer-to-peer technical support team for other MSPs.

63.     For example, one MSP complained in an email to Matterport: "I have promised agents two tours and each one is screwed up." "My view, for what its worth. 1. Little to no interest in training agents how to use your product. 2. Videos you direct us to are old and irrelevant to a certain extent."

***Omission #1***
***Matterport would compete against MSPs by selling 3D cameras***
***to the MSPs' customers, such that the customers would no***
***longer need the MSPs to do the scanning for them***

64.     Defendants failed to disclose that Matterport would be competing against MSPs by selling cameras to MSPs' customers.

- 12 -

65.     An internal presentation given to Matterport sales representatives about sales takeaways and new sales processes shows that they were given instructions to sell cameras to MSPs' customers. For example, the internal presentation stated:

> "Whenever pushback on price/camera sale, push to MSP+
>
> **2)     Never lose lead by letting them go to the MSP on their own – LET ME EXPEDITE THE PROCESS FOR YOU**
>
> **Fill out MSP form with them on phone**
>
> **3)     Use MSP program to drive trials, and set up upsell call for 30 days later**
>
> **4)     Delight MSPs by sending them leads** (caveat – we might need to manage the message since *our goals will be to up sell the camera* in many cases)" (italics added).

66.     This presentation also included a sales process flow chart for Matterport sales representatives to use to sell cameras to MSPs' customers.

### *Omission #2*
### *Despite publicly announcing the withdrawal of a pilot program, Matterport surreptitiously continued to operate the program as part of a business model designed to compete against MSPs*

67.     Defendants failed to disclose that the MSP program could be abandoned and that MSPs' investment in creating and building their MSP business would be lost.

68.     Defendants failed to disclose that they were actually setting up their own scanning network where they set the price, and actually become a direct competitor for scanning business against the MSPs. Specifically, after MSPs built Matterport-based websites for their business opportunity, participants in the MSP program were, in effect, just free marketers and promoters of the Matterport equipment and required Cloud Service arrangements.

69.     "Lion" was a pilot program that Matterport launched in San Francisco in July 2017, as Matterport was going to get into the scanning business. "Lion" was the precursor to the Capture Services program. After word got out to MSPs about the "lion" pilot, Matterport quickly experienced a backlash from MSPs complaining that Matterport would be directly competing

1    with them if the "lion" program continued. Matterport responded to MSPs' complaints by

2    announcing it was withdrawing the pilot program.

3          70.    However, despite this conflict of interest and announcement of discontinuation,

4    Matterport continued the "lion" program surreptitiously while Matterport continued to enroll

5    people into the MSP program, but Matterport was not telling the prospective MSPs about it when

6    Matterport was enrolling them into the MSP program. Additionally, in or about February 2019,

7    Matterport surveyed MSPs about what they charged for their scanning services. On information,

8    investigation, and belief, Matterport then used that information to devise pricing for Matterport

9    Capture Services to the detriment of MSPs, so that Matterport could undercut MSPs' pricing and

10   steal the MSPs' customers.

11         71.    Eventually, Matterport internally acknowledged that announcing the Capture

12   Services program would eliminate the "secret operation." Matterport Capture Services was

13   announced in Spring 2020.

14         72.    Matterport promotes "Matterport Capture Services" on its website and states "Let

15   us capture for you." *See* https://matterport.com/capture-services. Matterport set the pricing for

16   Matterport Capture Service technicians' scans, and Matterport requires that a Capture Services

17   customer purchase a subscription plan—such as a Starter, Professional, or Business plan—or

18   contact Matterport for custom enterprise plans.

19         73.    After Capture Services was announced, numerous MSPs complained that instead

20   of helping them grow their business as Matterport promised, Matterport developed the Capture

21   Services program and was competing against MSPs by, *inter alia*, undercutting MSPs' prices.

22   MSPs complained that they lost customers who hired Matterport Capture Services technicians

23   instead of the MSPs, and that Matterport's Capture Services plans prohibited MSPs' clients from

24   selecting and continuing to do business with their existing MSPs.

25         74.    Despite publicly announcing the withdrawal of a the "lion" program, Matterport

26   surreptitiously continued to operate the program as part of a business model designed to compete

27   against MSPs. Matterport surreptitiously continued to develop the Capture Services program after

28   publicly announcing that it had withdrawn the program.

75.    Matterport failed to disclose that it would be using the data generated by MSPs to then enter their local geographic markets and offer to provide scans at a fraction of the cost that would otherwise be borne by MSPs, thereby cannibalizing the market and harming MSPs' ability to earn money from their Matterport scanning business.  Thus, not only did Matterport fail to deliver on vetted leads or prospective leads as promised, but by entering the market and undermining the cost or service fees of their MSPs, Matterport undercut the ability of MSPs to market scanning services in their communities. Matterport's actions to enter local markets, failure to provide the promised business leads, and lack of technical support, basically renders the MSP program worthless, and actually invites MSP clients to seek out Matterport directly since Matterport has access to this information through the Capture Services program.

76.    As a direct and proximate result of Matterport's conduct, Plaintiff and the Class have suffered damages and will continue to suffer damages if an injunction is not issued to prevent Matterport from entering into exclusive deals with MSPs' customers and pursuing leads meant for MSPs.

77.    As set forth herein, Plaintiff lost one of his best clients to Matterport Capture Services. Other MSPs also complained about losing clients to Matterport. For example, in a Facebook post from Steven K.G. Tibbe to the Matterport User Group, he stated: "I lost a client directly to Matterport's sales team today."

### Matterport's Sales of 3D Cameras and Cloud Services Offered a Seller Assisted Marketing Plan

78.    California imposes disclosure requirements on persons or companies, such as Defendants, seeking to offer "business opportunities" or "seller assisted marketing plans." The law applies to promises or offers to engage in a money making enterprise conditioned on the purchase of the seller's goods, equipment, supplies, or services.

79.    The California Legislature passed the SAMP Act based on a series of predatory marketers of products/services with all strings attached seeking consumers and purchasers who are not savvy to the potential "lucrative" market for products and services located in already saturated geographic market areas. One wave of this activity was to sell "vending machines" for large up-front

costs and then service fees to keep the equipment running and another wave of "envelope stuffers" to "assist" in the marketing and placement of said equipment. "The initial payment is usually in the form of a purchase of overpriced equipment or products" and thereafter requires additional monies in order to stay invested in a losing proposition. Hence, the legislative intent behind the SAMP Act was "to provide each prospective seller assisted marketing plan purchaser with the information necessary to make an intelligent decision regarding seller assisted marketing plans being offered; to safeguard the public against deceit and financial hardship; to insure, foster and encourage competition and fair dealing in the sale of seller assisted marketing plans by requiring adequate disclosure; to prohibit representations that tend to mislead; and to prohibit or restrict unfair contract terms. *This title shall be construed liberally in order to achieve the foregoing purposes.*" *See* Cal. Civ. Code § 1812.200(b) [emphasis added].

80.    A "seller assisted marketing plan" is defined by California Civil Code section 1812.201 as any sale or lease or offer to sell or lease any product, equipment, supplies, or services within a certain price range that will aid a purchaser or will be used by or on behalf of the purchaser in connection with or incidental to beginning, maintaining, or operating a business when the seller assisted marketing plan seller has advertised or in any other manner solicited the purchase or lease of the seller assisted marketing plan and done any of the following acts:

>    (1) Represented that the purchaser will earn, is likely to earn, or can earn an amount in excess of the initial payment paid by the purchaser for participation in the seller assisted marketing plan.

>    (2) Represented that there is a market for the product, equipment, supplies, or services, or any product marketed by the user of the product, equipment, supplies, or services sold or leased or offered for sale or lease to the purchaser by the seller, or anything, be it tangible or intangible, made, produced, fabricated, grown, bred, modified, or developed by the purchaser using, in whole or in part, the product, supplies, equipment, or services that were sold or leased or offered for sale or lease to the purchaser by the seller assisted marketing plan seller.

Cal. Civ. Code § 1812.201.

81.    California requires sellers of seller assisted marketing plans to register with the Office of the Attorney General, and sets forth disclosure requirements to prospective customers. Cal. Civ. Code §§ 1812.203, 1812.205.

1

*Allegations Specific to Shawn Lynch*

2      82.    Lynch reasonably relied on Defendants' foregoing misrepresentations and

3  omissions and purchased a Matterport 3D camera and associated Cloud services. In or around

4  March 2018, Lynch responded to a solicitation and advertisement for a "business opportunity"

5  relating to the use of 3D camera imaging from multiple solicitations from Defendants. Defendants

6  provided false statements such as "Pre-qualified local leads seeking 3D scanning services is a benefit

7  of our MSP program"; "We match MSPs on local proximity to leads who come in requesting a scan

8  service. We've created the necessary resources and materials you need to sell Matterport on your

9  own and generate business too!" Lynch relied on these representations and the other representations

10 set forth above, and entered into a "seller assisted marketing plan" contract with Defendants.

11     83.    After reviewing Matterport's misrepresentations on the MSP pages on Matterport's

12 website and hearing the misrepresentations from Matterport sales representatives, Lynch purchased

13 a Matterport Pro2 3D camera on March 28, 2018, based on Matterport's misrepresentations and

14 omissions.

15     84.    In order to become an MSP, Lynch had to purchase a 3D camera and pay an annual

16 access fee for Cloud services and software support in the amount of $499.00 per year. Lynch

17 purchased the camera and paid for Cloud services so he could become an MSP. Lynch never

18 received any of the disclosures required by the SAMP Act.

19     85.    Lynch has been an MSP since April 25, 2018. Lynch learned about the MSP

20 program from the Matterport sales representatives and the MSP program pages on Matterport's

21 website, and he enrolled in the MSP program by filling out an online form on Matterport's

22 website.

23     86.    Lynch invested his time in learning to use Defendants' hardware equipment and

24 software and starting, promoting, and maintaining his MSP business. Lynch also incurred out-of-

25 pocket costs related to starting, promoting, and maintaining his MSP business, including purchasing

26 the 3D camera, an iPad, a tripod mount, website development fees, 3D headsets, the annual fee for

27 Cloud services, and general liability insurance.

28

87.    Before Lynch applied to the MSP program, Matterport's website represented that Matterport would provide MSPs with pre-qualified local leads seeking 3D scanning services. Lynch relied on that representation in deciding to become an MSP. However, after Lynch became an MSP, he received very few "leads," and they were mostly other MSPs fishing for information.

88.    The "filtered leads" were simply mass emails to the same geographic location for many of the persons promised "lucrative business opportunities."

89.    Lynch's purchase of a Matterport 3D camera resulted in only a few leads, and several of the purported "leads" were actually competitors fishing for information. 3D imaging services were already a saturated market, all with the same or similar equipment and same or similar promises. Lynch registered two different geographical locations for receiving leads from Matterport. Since becoming an MSP on April 25, 2018, Lynch has received approximately 44 leads to date. After the Capture Services program was announced the number of leads that Plaintiff received dropped to two in 2021, and one of those leads was blank. Plaintiff received no leads in 2022.  Given that Lynch was registered as an MSP in two different geographical locations for leads, he should have received twice as many leads as someone with only one geographical location. For the two different geographical locations that Lynch registered with Matterport, he received approximately 44 leads in an approximately 56 month period (May 2018-January 2023), which equates to less than 1 lead per month.

90.    Lynch's understanding of the benefits of the MSP program was that Matterport would assist MSPs, not directly compete with MSPs for scanning clients.

91.    Lynch provides scanning services in Virginia, Maryland, the Washington D.C. area, New York, New Jersey, and Connecticut.

92.    As business picked up, Lynch purchased a second Matterport Pro 2 camera. However, because Matterport has been competing with Lynch, Lynch has only been using one of the cameras.

93.    One of Lynch's regular clients has been Cushman & Wakefield. Cushman & Wakefield contacted Lynch directly and first utilized Lynch's services in April 2020. Lynch did *not* acquire Cushman & Wakefield as a client via a "lead" from Matterport. This client provided

Second Amended Class Action Complaint                                    22 CV 03704-WHA

approximately 13% of Lynch's company's revenue for 2020, and approximately 26% of Lynch's company's revenue for 2021.

94.    In January 2022, Cushman & Wakefield notified Lynch that they signed up with Matterport Capture Services and would no longer need his services. Lynch lost business as a direct result of Matterport competing against him with its Capture Services program.

95.    As a result of the aforementioned conduct, Lynch seeks damages and restitution on behalf of himself and the Class defined below, as against all Defendants, in an amount according to proof, including his out-of-pocket costs and his lost profits. Additionally, Lynch seeks injunctive and/or declaratory relief on behalf of himself and the Class defined below, as against all Defendants, to, *inter alia*, enjoin Defendants from operating the Matterport Capture Services program and competing against Lynch and Class members.

## CLASS ACTION ALLEGATIONS

96.    Plaintiff brings this action on behalf of himself and all other similarly situated persons as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4). The Class that Plaintiff seeks to represent is comprised of and defined as follows (the "Class"):

> All persons in the United States who, within the applicable statute of limitations, (a) did not previously own a Matterport 3D camera, (b) applied online through Matterport's website and became a Matterport Service Partner ("MSP"), and (c) purchased a Matterport 3D camera or Matterport Cloud services in connection with becoming an MSP, or incurred other expenses to start or operate their MSP business.

Excluded from the Class are: (1) Defendants and Defendants' agents; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

97.    Plaintiff reserves the right under Federal Rule of Civil Procedure 23 to amend or modify the Class to include a broader scope, greater specificity, further division into subclasses, or

1    limitations to particular issues. Plaintiff reserves the right under Federal Rule of Civil Procedure

2    23(c)(4) to seek certification of particular issues.

3          98.     This action is brought and may be maintained as a class action pursuant to Federal

4    Rule of Civil Procedure 23 because there is a well-defined common interest of many persons and it

5    is impractical to bring them all before the court.

6          99.     **Ascertainable Class**: The proposed Class is ascertainable in that their members can

7    be identified by Defendants' corporate sales and service records for sales of 3D cameras and Cloud

8    services, and enrollment in the MSP program.

9          100.    **Numerosity**: The potential quantity of members of the Class, as defined, is believed

10   to be 2,377, persons and is so numerous that joinder of all members would be unfeasible and

11   impractical. The disposition of their claims through this class action will benefit both the parties and

12   this Court.

13         101.    **Typicality**: Plaintiff's claims are typical of the claims of all members of the Class

14   because all members of the Class suffered similar injuries, losses, are owed restitution and/or

15   pecuniary economic damages arising out of Defendants' common course of conduct in violation of

16   law, and the injuries and damages of all members of the Class were caused by Defendants' wrongful

17   conduct in violation of law, as alleged herein.

18         102.    **Adequacy**: Plaintiff is an adequate representative of the Class, will fairly protect the

19   interests of the members of the Class, has no interests antagonistic to the members of the Class, and

20   will vigorously pursue this suit via attorneys who are competent, skilled, and experienced in litigating

21   matters of this type. Class Counsel is competent and experienced in litigating class actions.

22         103.    **Superiority**: The nature of this action and the nature of laws available to Plaintiff

23   make use of the class action format a particularly efficient and appropriate procedure to afford relief

24   to Plaintiff for the wrongs alleged herein, as follows:

25                 a.     This case involves a large corporate Defendant and a sufficient numerous

26                        group of Class members with many relatively small claims and common

27                        issues of law and fact;

28                 b.     If each individual member of the Class was required to file an individual

- 20 -

lawsuit, the large corporate Defendant would necessarily gain an unconscionable advantage because Defendants would be able to exploit and overwhelm the limited resources of each individual member of the Class with Defendants' superior financial and legal resources;

c.   Proof of a common business practice or factual pattern, of which the members of the Class experienced, is representative of the Class herein and will establish the right of each of the members of the Class to recover on the causes of action alleged herein;

d.   The prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual members of the Class against Defendants; and which would establish potentially incompatible standards of conduct for Defendants; and/or legal determinations with respect to individual members of the Class which would, as a practical matter, be dispositive of the interest of the other members of the Class who are not parties to the adjudications or which would substantially impair or impede the ability of the members of the Class to protect their interests;

e.   The claims of the individual members of the Class are not sufficiently large enough to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto without aggregation of claims and losses attributed to Defendants' illegal and deceptive conduct;

f.   As the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action; and

g.    The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

104.    **Existence and Predominance of Common Questions of Fact and Law**: There are common questions of law and fact as to the members of the Class which predominate over questions affecting only individual members of the Class including, without limitation:

a.    Whether Defendants' sale of 3D cameras and associated Cloud services through Defendants' MSP program constituted a "seller assisted marketing plan" and "sale of business opportunity," such that disclosure was required by the SAMP Act, as alleged herein;

b.    Whether Defendants failed to provide the required disclosures to potential purchasers, as alleged herein;

c.    Whether Defendants engaged in false and misleading advertising when advertising and soliciting business for the purchase of Defendants' equipment and services pursuant to the MSP program;

d.    Whether Defendants' false representations in connection with the sale of 3D cameras and associated Cloud services through Defendants' MSP program are likely to mislead reasonably prudent consumers acting reasonably under the circumstances;

e.    Whether Defendants made omissions of material facts;

f.    Whether Defendants breached the implied covenant of good faith and fair dealing;

g.    Whether Class members are entitled to damages, including punitive damages;

h.    Whether Class members are entitled to restitution due to lost profits or diminished sales as a direct and legal result of Defendants' unlawful, deceptive, and/or fraudulent business acts or practices in relation to Defendants' promotion, solicitation, and sale of equipment and services

1      under the MSP program and Defendants' Capture Services program;

2      i.      Whether Class members are entitled to rescind all of their contracts with

3              Defendants;

4      j.      Whether Class members are entitled to injunctive and/or declaratory relief;

5      k.      Whether Class members are entitled to restitution;

6      l.      Whether Defendants are liable for pre-judgment interest; and

7      m.      Whether Defendants are liable for attorneys' fees and costs.

8      105.    Further, Defendants have acted or refused to act on grounds generally applicable

to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to

the Class members as a whole is appropriate under Rule 23(b)(2). As plead herein, Defendants

have committed a tort or wrongful act. Defendants never provided required disclosures under the

SAMP Act, did not comply with registration requirements, engaged in deceptive, unlawful, and

unfair trade practices, and breached the covenant of good faith and fair dealing.

106.   Matterport deliberately shifted its business model and surreptitiously developed the

Capture Services program to compete against MSPs, while Matterport was selling 3D cameras

and Cloud Services to Plaintiff and Class members and enrolling them into the MSP program.

Rather than helping MSPs build their businesses as promised, Matterport competes with MSPs

by offering special low pricing to prospective clients it wants to have that undercuts MSPs in the

market.

107.   After the Capture Services program was announced, the number of leads that

Plaintiff received dropped to two in 2021, and one of those leads was blank. Plaintiff received no

leads in 2022. On information and belief, Class members experienced the same situation as

Plaintiff—*i.e.*, their leads dried up after Capture Services was announced—because Defendants

referred the leads to Capture Services technicians instead of MSPs.

108.   Defendants' current "Find a Matterport Service Partner" webpage includes the

statement, "…aren't ready to invest in a camera? Try out Matterport's Capture Services. … If

your city isn't in the network, you can check whether there's a Matterport Service partner (MSP)

in your local area to scan the property for you." *See* https://support.matterport.com/s/article/Find-

1    a-Matterport-Service-Partner?language=en_US (last accessed Feb. 15, 2023).

2        109.    Defendants' current webpage includes the statement, "And if you'd rather have

3    someone else do the scanning, we can take care of it for you with Matterport Capture Services."

4    *See* https://matterport.com/cameras (last accessed Feb. 15, 2023).

5        110.    The Matterport Capture Services program constitutes an actual or threatened injury

6    to MSPs' property or personal rights which cannot be compensated by an ordinary damage award.

7    *Brownfield v. Daniel Freeman Marina Hosp.*, 208 Cal. App. 3d 405, 410, 256 Cal. Rptr. 240, 243

8    (Ct. App. 1989).

9        111.    Through the Matterport Capture Services program, Matterport has taken clients and

10   potential clients away from Plaintiff and other MSPs. Plaintiff lost one of his regular clients,

11   Cushman & Wakefield—which had provided approximately 26% of his company's revenue for

12   2021—to Matterport Capture Services.

13       112.    Other MSPs have complained about losing clients to Matterport. For example, in a

14   public Facebook post from Steven K.G. Tibbe to the Matterport User Group, the MSP states: "I lost

15   a client directly to Matterport's sales team today."

16       113.    In an email chain dated July 14, 2021, Jeffrey Fong and Kailyn Wilson discussed an

17   email from an MSP who complains that (i) Matterport is signing his customers to low cost Capture

18   Services programs that are half the price he and many MSP's charge for scanning, and (ii)

19   "Matterport continually goes after all my and every MSP's customers."  After Wilson asks Fong if

20   he can "handle this?", Fong responds: "Was chatting with Brendan on what our position was. Will

21   probably see this more unfortunately."

22       114.    In another email chain between an MSP customer and Matterport employees,

23   including Jeffrey Fong and Kailyn Wilson, the MSP customer wants to use her MSP to perform

24   scanning services, but Matterport tells her she cannot use him because he is not part of the Capture

25   Services program, and Matterport will not allow him to be added to the Capture Services program.

26       115.    If the Capture Services program is allowed to continue, then MSPs will continue to

27   suffer damages, including lost profits and lost business opportunities.

28

116.    The declaratory and injunctive relief sought in this case includes, but is not limited to:

a.    Entering a declaratory judgment against Defendants—declaring that Defendants' representations are false and misleading as to business opportunity and gains, as well as with regard to the ownership of scanned images, since the author of the image is the person who did the scan—and enjoining Defendants from continuing to assert that the MSPs' scans are the property of Matterport;

b.    Entering an injunction against Defendants to (i) prevent Matterport from continuing to operate its Capture Services program and compete against MSPs, (ii) prevent Matterport from promoting its Capture Services program on its "Find a Matterport Service Partner" webpage, and (iii) provide leads for scanning jobs to MSPs;

c.    In the alternative to completely stopping the Capture Services program, Plaintiff seeks an injunction to prevent Matterport from taking MSPs' clients, and to prevent Matterport from not allowing MSPs' clients to use their preferred MSPs, and to compensate Plaintiff and MSPs for any clients taken by Capture Services technicians.

117.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Matterport misrepresented that the 3D camera is easy to use or it is easy to learn and perform 3D scanning;

- 25 -

b.   Whether Matterport misrepresented that Matterport would provide the training materials MSPs need to learn to operate the 3D camera and perform 3D scans;

c.   Whether Matterport misrepresented that the MSP program is a lucrative business opportunity or that MSPs will recoup their initial investment within a matter of months;

d.   Whether Matterport misrepresented that Matterport would provide MSPs with pre-qualified leads from individuals or businesses;

e.   Whether Matterport misrepresented that Matterport would provide the tools and resources to ensure the success of an MSP's business;

f.   Whether Matterport sold 3D cameras directly to individuals or businesses;

g.   Whether Matterport developed a program wherein Matterport refers prospective customers to Capture Services technicians for scanning services;

h.   Whether Defendants engaged in fraudulent, unfair or unlawful business practices, or unfair, deceptive, untrue or misleading advertising, in violation of California's Unfair Competition Law;

i.   Whether Defendants engaged in untrue or misleading advertising that is known, or which reasonably should be known, to be untrue or misleading, in violation of California's False Advertising Law;

j.   Whether Defendants breached the implied covenant of good faith and fair dealing;

k.   Whether Defendants complied with the registration and disclosure requirements of the SAMP Act;

l.   Whether Defendants violated the SAMP Act.

118.   **Manageability and Superiority of Class Action Procedure**: The nature of this action and the nature of laws available to Plaintiff make use of the class action format a particularly efficient and appropriate procedure to afford relief to Plaintiff for the wrongs alleged herein. Plaintiff and proposed Class Counsel will obtain necessary consultants, economists, and accountants that can

- 26 -

review the books, sales reports, and sales transaction records, and articulate the nature of the claims for restitution, damages, and declaratory/injunctive relief to enjoin Defendants from continuous and ongoing violations of the law.

## CAUSES OF ACTION

### COUNT I
### Violation of Seller Assisted Marketing Plan Act, Cal. Civ. Code §§ 1218.200, *et seq*.
### (By Plaintiff, On Behalf of the Class, and Against each Defendant)

119.    Plaintiff realleges paragraphs 1-118 of this complaint as though fully set forth herein.

120.    Defendants' conduct, as alleged herein, in advertising, promoting, and selling Matterport 3D cameras, "Cloud Service Plans," and the MSP program rendered Defendants a seller of a seller assisted marketing plan. Cal. Civil Code § 1812.201.

121.    Plaintiff and Class members purchased Matterport 3D cameras, "Cloud Service Plans," and participated in Defendants' MSP program by entering into contracts for equipment and services from Defendants to obtain a business opportunity and lead assistance.

122.    Defendants' offers to sell and Defendants' sales to Plaintiff and Class members occurred in California for one or more of the following reasons: (1) Defendants' offer to sell was made in this state; (2) the purchaser resided in this state at the time of the offer or sale; (3) the offer to sell either originated from this state or was directed by the seller to this state and received at the place to which it was directed; and (4) Plaintiff and Class members communicated Plaintiff's and Class members' acceptance to Defendants situated in this state. *See* Cal. Civ. Code § 1812.202(a)-(b).

123.    In addition, the terms of sale governing Plaintiff's and Class members' purchases of Matterport 3D cameras, and governing Matterport's Cloud Service Plan between Defendants and Plaintiff and Class members, provide that these sales "shall be interpreted in accordance with the laws of the state of California without reference to its conflict of law provisions." The Matterport Terms of Use further provide that its services are "controlled and operated by Matterport from its offices within the State of California."

124.    Defendants failed to comply with registration requirements for seller assisted marketing plans and business opportunities, namely Cal. Civ. Code section 1812.203.

125.    Defendants failed to comply with disclosure requirements for seller assisted marketing plans and business opportunities, namely Cal. Civ. Code sections 1812.205-206.

126.    In addition, in making untrue, false, misleading, and deceptive statements in connection with their sale of 3D cameras and related Cloud services to Plaintiff and Class members, Defendants engaged in prohibited, deceptive, and fraudulent conduct in violation of Cal. Civ. Code section 1812.204.

127.    The applicable statute of limitations for Count I is three years under Cal. Code Civ. Proc. section 338(a), and Cal. Civ. Code section 1812.215.

128.    As a direct, legal, and proximate result of Defendants' unlawful and unfair business practices, Plaintiff and Class members have suffered injury in fact and harm, actual damage and losses, and are entitled to rescind their contracts and obtain judgment for actual damages, statutory damages, punitive damages, and other damages, in an amount according to proof. *See* Cal. Civ. Code §§ 1812.215(a), 1812.218.

129.    Plaintiff will seek recovery of reasonable attorneys' fees and litigation costs as provided for enforcement of an important public right in an amount according to proof and subject to court approval.

130.    To the extent losses and damages are reasonably ascertainable, Plaintiff will seek pre- and post-judgment interest at the legal rate of 10% per annum as part of the judgment.

## COUNT II
### Violation of California Business & Profession Code §§ 17200, *et seq.* for Engaging in Unlawful, Unfair, and Deceptive Business Acts and/or Practices
### (By Plaintiff, On Behalf of the Class, and Against each Defendant)

131.    Plaintiff realleges paragraphs 1-118 of this complaint as though fully set forth herein.

132.    California Business & Professions Code section 17200 prohibits "unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising."

133.    California Business & Professions Code section 17203 provides in pertinent part:

Any person who engages, has engaged, or proposes to engage in unfair

- 28 -

competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure . . .

134.    As alleged above, Defendants have engaged and continue to unlawfully engage in fraudulent, unfair, and unlawful business practices by making false representations and omissions of material fact regarding the market for 3D scanning services, the profitability of 3D scanning services, the ease of learning how to use the 3D cameras to create the 3D scans, the nature and efficacy of Defendants' assistance in rendering 3D scanning services, and omitted and concealed that Matterport would become a direct competitor against MSPs by selling 3D cameras to MSPs' clients and starting its own scanning service to compete against MSPs.

135.    Defendants engaged in fraudulent, unfair, and unlawful conduct by failing to comply with the registration and disclosure requirements set forth by the SAMP Act, and engaging in deceptive, misleading, and false advertising in connection with the sale of their 3D cameras and the business opportunity as a member of their MSP program.

136.    Defendants' representations, solicitations, advertisement, and marketing materials claim that their MSP program will provide a lucrative business opportunity and that, with their pre-qualified lead filtering, the initial purchase price of Matterport's 3D cameras will be recouped within a matter of months. Plaintiff, and upon information and belief the Class members, have received few leads, have not been able to develop the promised lucrative business, and continue to pay monthly fees to maintain access to the scanned images they created, which Matterport contends is its intellectual property even though Matterport did nothing to capture the initial images.

137.    All of this was designed to conceal the fact that the MSP program is a fraudulent scheme to (a) generate revenue to Matterport through the sale of 3D cameras to MSPs, and (b) use MSPs as "show people" to perform scans for reluctant 3D camera buyers so that Defendants could subsequently contact those people and sell them 3D cameras, all while Defendants were

1  secretly developing the Capture Services program to compete with the MSPs.

2        138.    Plaintiff and the members of the Class reasonably relied on Defendants' fraudulent,

3  unfair, and unlawful conduct alleged herein. Plaintiff and the members of the Class would not have

4  purchased Defendants' 3D cameras, purchased Matterport's Cloud subscriptions, and incurred out-

5  of-pocket expenses to start and operate their own MSP business, had they known Defendants'

6  representations were false and/or had they been aware of Defendants' omissions of material fact.

7        139.    California Business & Professions Code sections 17500, *et seq*. prohibits untrue or

8  misleading advertising that is known, or which reasonably should be known, to be untrue or

9  misleading. A violation of California Business & Professions Code sections 17500, *et seq*. is also a

10  violation of Sections 17200, *et seq*., which prohibits "any unfair, deceptive, untrue or misleading

11  advertising." *Committee on Children's Television, Inc. v. General Foods Corp.,* 35 Cal.3d 197, 210

12  (Cal. 1983).

13        140.    As a direct, legal, and proximate result of Defendants' unlawful and unfair business

14  practices, Plaintiff and Class members have suffered injury in fact and have lost money or property

15  in terms of out-of-pocket losses, lost time and effort, lost sales and diminished profits, and equipment

16  that only operates properly with continued fees paid to Defendants. Accordingly, Plaintiff and Class

17  members are entitled to rescind their contracts and/or obtain damages and restitution from

18  Defendants caused by Defendants' unlawful, unfair, and fraudulent business practices, in an amount

19  according to proof. Cal. Bus. & Prof. Code §§ 17203-17204.

20        141.    The statute of limitations applicable to Count II is four years. *See* Cal. Bus. & Prof.

21  Code § 17208.

22        142.    Plaintiff requests a declaration that Defendants' conduct constitutes an ongoing

23  violation of the SAMP Act, and will ask the Court to enjoin Defendants from engaging in illegal

24  conduct that is continuous and ongoing as of the date of commencement of this action.

25        143.    Further, in addition to restitution, declaratory and injunctive relief, Plaintiff seeks an

26  award of reasonable attorneys' fees and costs, and expenses for an accounting, based on enforcement

27  of a key and critical matter of public and concern pursuant to Cal. Code of Civ. Proc. section 1021.5,

28  in an amount according to proof and subject to Court approval.

- 30 -

1

2

3

**COUNT III**
**Violation of the False Advertising Law,**
**California Business & Professions Code §§ 17500,** *et seq.*
**(By Plaintiff, On Behalf of the Class, and Against each Defendant)**

4      144.    Plaintiff realleges paragraphs 1-118 of this complaint as though fully set forth herein.

5      145.    California Business & Professions Code sections 17500, *et seq.* prohibits untrue or

6  misleading advertising that is known, or which reasonably should be known, to be untrue or

7  misleading.

8      146.    Defendants' representations, solicitations, advertisement, and marketing materials

9  claim that their MSP program will provide a lucrative business opportunity and that, with their pre-

10  qualified lead filtering, the initial purchase price of Matterport's 3D cameras will be recouped within

11  a matter of months. Plaintiff, and upon information and belief the Class members, have received few

12  leads, cannot profit in the manner Matterport represented from their equipment, and continue to pay

13  monthly fees to access scanned images and avoid losing access to images they created, which

14  Matterport contends is its intellectual property even though Matterport did nothing to capture the

15  initial images. Defendants have made false representations and omissions of material fact regarding

16  the market for 3D scanning services, the profitability of 3D scanning services, the ease of learning

17  how to use the 3D cameras to create the 3D scans, the nature and efficacy of Defendants' assistance

18  in rendering 3D camera services, and omitted and concealed that Matterport would become a direct

19  competitor against MSPs by selling 3D cameras to MSPs' clients and starting its own scanning

20  service to compete against MSPs.

21      147.    The Court has found that the statute of limitations applicable to Count III is three

22  years. Pursuant to the discovery rule, Count III is timely because Plaintiff (and Class members)

23  would not have been on notice to discover, until the Capture Services program was publicly

24  announced in Spring 2020, that the MSP program as a fraudulent scheme to (a) generate revenue

25  to Matterport through the sale of 3D cameras to MSPs, and (b) use MSPs as "show people" to

26  perform scans for reluctant 3D camera buyers so that Defendants could subsequently contact

27  those people and sell them 3D cameras, all while they were secretly developing the Capture

28  Services program to compete with the MSPs.

- 31 -

148.    As a direct, legal, and proximate result of Defendants' illegal, unfair, and deceptive conduct and business practices, Plaintiff and Class members have suffered actual harm and injury in the loss or diminishment of sales directly related to the unfair and anti-competitive advantage exploited by Defendants. Plaintiff, on behalf of himself and the members of the Class, will seek damages and restitution from Defendants in an amount according to proof. Cal. Bus. & Prof. Code §§ 17200, 17203-17204.

149.    Plaintiff requests and will seek an order declaring that Defendants' representations are false and misleading as to business opportunity and gains, as well as with regard to the ownership of scanned images, since the author of the image is the person who did the scan.  Members of Defendants' MSP program were misled and, if they ever stop payment of the monthly fee, they lose all access to their prior images.

150.    In addition to damages, restitution, and declaratory and injunctive relief, Plaintiff will seek an award of reasonable attorneys' fees and costs, and expenses for an accounting, based on enforcement of a key and critical matter of public and concern pursuant to Cal. Code of Civ. Proc. section 1021.5, in an amount according to proof and subject to Court approval.

### COUNT IV
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(By Plaintiff, On Behalf of the Class, and Against each Defendant)**

151.    Plaintiff realleges paragraphs 1-118 of this complaint as though fully set forth herein.

152.    Plaintiff and Class members had a contract with Matterport regarding the MSP program. To be eligible for the MSP program, Plaintiff and Class members had to own at least one Matterport 3D Camera, have a current subscription to the Matterport Cloud Services, and must agree to the Matterport Terms and Conditions.

153.    Matterport promised to provide pre-qualified leads for 3D scanning jobs and marketing assistance to Plaintiff and Class members. Matterport promised to facilitate MSPs' business expansion, and provide leads and marketing materials and technical training, to ensure the success of the MSPs' scanning business.

154.    The law implies in every contract a covenant of good faith and fair dealing.

155.    Matterport owes a duty to Plaintiff and Class members not to do anything that will injure their rights to receive the benefits of the agreement. Stated in other words, Matterport owes Plaintiff and Class members a duty to do everything that the agreement presupposes Matterport will do to accomplish its purpose. Matterport promised to help MSPs build their own Matterport business. The necessary implication of Matterport's promise to provide MSPs with leads is that Matterport will not directly compete with MSPs for these potential leads, withhold these leads from MSPs, and conceal that conduct from them.

156.    Matterport's conduct in competing against Plaintiff and Class members when Matterport promised them that Matterport would facilitate MSPs' business expansion and provide leads and marketing materials and technical training constituted objectively unfair competition and unfair conduct.

157.    Matterport directs high value MSP leads to its inside sales representatives, rather than sharing the leads with MSPs, so Matterport can try to sell them a camera instead of referring the lead to an MSP. Additionally, Matterport pursues potential clients by offering them Capture Services technicians with special low pricing in order to undercut MSPs, so Matterport can get the scanning business instead of referring the business to MSPs. And, Matterport actively pursues MSPs' current customers to steal them away from the MSPs and either sell them a 3D camera or enroll them into Matterport's Capture Services program. This misconduct is ongoing.

158.    The applicable statute of limitations for Count IV is four years. See Cal. Civ. Proc. Code § 337(a).

159.    Matterport's breach of the implied covenant of good faith and fair dealing proximately caused Plaintiff and Class members injury and damages, as they were unable to receive opportunities to pursue leads for 3D scanning business because Matterport met the demand before communicating those leads to Plaintiff and Class members. Plaintiff and Class members were consequently deprived of potential leads and clients by Matterport who had a contractual duty to do the opposite (*i.e.*, provide the filtered leads to the MSPs so the MSPs, not Matterport, could get the business). Additionally, Matterport breached the implied covenant of good faith and fair dealing by contacting MSPs' customers and selling them cameras so that those customers would no longer need

to pay the MSPs to do the scanning for them.

160.    Matterport competes with MSPs through its Capture Services program, which has special pricing to undercut MSPs. Matterport was secretly developing this program—designed to directly compete against MSPs—at the same time Matterport was making the false representations complained of herein and enrolling Plaintiff and Class members into the MSP program. Through the Capture Services program, Matterport has taken opportunities away from MSPs who Matterport had promised to help grow their business, and Matterport has taken away, and continues to take away, MSPs' existing clients.

161.    The MSP program as a fraudulent scheme to (a) generate revenue to Matterport through the sale of 3D cameras to MSPs, and (b) use MSPs as "show people" to perform scans for reluctant 3D camera buyers so that Defendants could subsequently contact those people and sell them 3D cameras, all while they were secretly developing the Capture Services program to compete with the MSPs.

162.    Plaintiff and Class members suffered damages as a result of Matterport's bad faith and unfair conduct in violation of its covenant of good faith and fair dealing, including lost profits.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing allegations, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment as follows:

a.    Certifying that this action may be maintained as a class action as permitted by Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), or 23(c)(4), and certifying the Class set forth herein, appointing the Plaintiff as representative of the Class, and appointing the law firms of Javitch Law Office and Zimmerman Law Offices, P.C. as Class Counsel for the Class;

b.    Entering judgment in favor of Plaintiff and the Class, and against Defendants, jointly and severally;

c.    Entering a declaratory judgment against Defendants—declaring that Defendants' conduct constitutes a violation of the SAMP Act;

d.    Entering a declaratory judgment against Defendants—declaring that Defendants' representations are false and misleading as to business opportunity and gains, as well as with regard to the ownership of scanned images, since the author of the image is the person who did the scan—and enjoining Defendants from continuing to assert that the MSPs' scans are the property of Matterport;

- 34 -

1           e.      Awarding Plaintiff and the Class restitution, and damages equal to the
amount of actual damages that they sustained, statutory or liquidated
2                damages allowable by law, and punitive damages;

3           f.       Awarding Plaintiff and the Class the remedy of rescission of contract, as
allowable by law;

g.      Entering an injunction against Defendants to prevent Matterport from
continuing to operate its Capture Services program and compete against
MSPs, to prevent Matterport from promoting its Capture Services program
on its "Find a Matterport Service Partner" webpage, and to provide leads for
scanning jobs to MSPs; or in the alternative to completely stopping the
Capture Services program, entering an injunction to prevent Matterport from
taking MSP's clients, and to prevent Matterport from not allowing MSPs'
clients to use their preferred MSPs, and to compensate Plaintiff and MSPs for
any clients taken by Capture Services technicians;

h.      Awarding Plaintiff and the Class attorney's fees and costs, including
interest thereon, as allowed or required by law; and

i.       Granting all such further and other relief as the Court deems just and
appropriate.

Dated: April 19, 2023         **ZIMMERMAN LAW OFFICES, P.C.**

                              By:  /s/ Thomas A. Zimmerman, Jr.     
                                   Thomas A. Zimmerman, Jr.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury to the extent authorized by law.

Dated: April 19, 2023         **ZIMMERMAN LAW OFFICES, P.C.**

                              By:  /s/ Thomas A. Zimmerman, Jr.     
                                   Thomas A. Zimmerman, Jr.