Mark L. Javitch
*mark@javitchlawoffice.com*
**JAVITCH LAW OFFICE**
3 East 3rd Ave. Ste. 200
San Mateo CA 94401
(650) 781-8000 telephone
(650) 648-0705 facsimile

Thomas A. Zimmerman, Jr. (admitted *pro hac vice*)
*tom@attorneyzim.com*
Sharon A. Harris (admitted *pro hac vice*)
*sharon@attorneyzim.com*
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com
*firm@attorneyzim.com*

Attorneys for Plaintiff and the Rule 23(c)(4) issue Class

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| SHAWN LYNCH, on behalf of himself and all other persons similarly situated, | ) ) ) | Case No. 3:22-cv-03704-WHA |
| Plaintiff, | ) ) ) ) | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MATTERPORT INC.'S MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) ) | |
| MATTERPORT, INC., a Delaware corporation; RJ PITTMAN, DAVE GAUSEBECK, MATT BELL, CARLOS KOKRON, PETER HEBERT, JASON KRIKORIAN, and MIKE GUSTAFSON, | ) ) ) ) ) ) | District Judge William H. Alsup Date: November 16, 2023 Time: 8:00 a.m. P.S.T. Courtroom: 12, 19th Floor (in person hearing) |
| Defendants. | ) ) ) ) ) | Class Action Complaint filed: March 28, 2022 Notice of Removal Filed: June 23, 2022 Trial date: December 11, 2023 |

## **TABLE OF CONTENTS**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

II.    STATEMENT OF ISSUES TO BE DECIDED ...........................................................2

III.   SUMMARY OF FACTUAL ALLEGATIONS...............................................................2

     A.    Plaintiff Shawn Lynch is the MSP, not I.C. Progress ...............................................2

     B.    Matterport Undermined its Own MSPs in Breach of the Implied Covenant of Good Faith and Fair Dealing.........................................................................................5

     C.    Certification of a Rule 23(c)(4) Issue Class ...............................................................7

IV.   LEGAL STANDARD.........................................................................................................7

V.    ARGUMENT .....................................................................................................................8

     A.    Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing............................................................................................................................8

     B.    Plaintiff Has Standing for His Breach of Implied Covenant of Good Faith and Fair Dealing Claim..........................................................................................................9

     C.    Plaintiff is a Party to the MSP Contract with Matterport .....................................11

     D.    Plaintiff Has Suffered Actual Damages..................................................................13

     E.    Plaintiff's Breach of Implied Covenant of Good Faith and Fair Dealing Claim is Not Barred, as a Matter of Law, by the Sherman Act.........................................14

VI.   CONCLUSION................................................................................................................20

i

## TABLE OF AUTHORITIES

*Cases*

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) ...................................................................14

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
4 F.Supp.3d 1123 (D. Ariz. 2014) (*aff'd*, 836 F.3d 1171 (9th Cir. 2016)) ...............18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986), ............................................................................................8

*Avidity Partners, LLC v. California*,
221 Cal. App. 4th 1180 (2013) ...........................................................................15

*B.K. by next friend Tinsley v. Snyder*,
922 F.3d 957 (9th Cir. 2019) ..............................................................................14

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988) .......................................................................................18, 19

*Cline v. Indus. Maint. Eng'g & Contracting Co.*,
200 F.3d 1223 (9th Cir. 2000) ..............................................................................8

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977)..............................................................................................18

*Copenbarger v. Morris Cerullo World Evangelism, Inc.*,
29 Cal.App.5th 1 (2018) .......................................................................................9

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986) .............................................................................19

*Erlich v. Glasner*,
418 F.2d 226 (9th Cir.1969) ................................................................................11

*Frame-Wilson v. Amazon.com, Inc.*,
591 F.Supp.3d 975 (W.D. Wash. 2022)................................................................16

*Ghazarian v. Magellan Health, Inc.*,
53 Cal. App. 5th 171 (2020), *as modified on denial of reh'g* (Aug. 31, 2020),
*review denied* (Nov. 10, 2020)..............................................................................8

*Gomez v. Alexian Bros. Hosp.*,
698 F.2d 1019 (9th Cir. 1983) .............................................................................10

*Hewlett-Packard Co. v. Oracle Corp.*,
65 Cal. App. 5th 506, 280 Cal. Rptr. 3d 21 (2021), *reh'g denied* (July 8, 2021),
review denied (Sept. 29, 2021), cert. denied, 142 S. Ct. 2709 (2022)....................9, 13

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .........................................................................16, 17

ii

*JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*,
   698 F.2d 1011 (9th Cir. 1983) .................................................................17, 18

*LaLonde v. Cnty. of Riverside*,
   204 F.3d 947 (9th Cir. 2000) ...........................................................................8

*Lazar v. Hertz Corp.*,
   143 Cal. App. 3d 128 (1983) ...........................................................................8

*Lee v. U.S. Taekwondo Union*,
   No. 04-00461 SOM-LEK, 2006 WL 319219 (D. Haw. Feb. 10, 2006) .................11

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ...................................................................................17-19

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   726 F.2d 1381 (9th Cir. 1984) .......................................................................19

*Marshall v. Kleppe*,
   637 F.2d 1217 (9th Cir. 1980) .......................................................................10

*Nolan v. Heald Coll.*,
   551 F.3d 1148 (9th Cir. 2009) ..........................................................................8

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
   904 F.3d 821 (9th Cir. 2018) ............................................................................8

*PowerTV Media, LLC v. St. Racing DigNight, LLC*,
   2017 WL 5665013 (C.D. Cal. 2017)................................................................19

*Sherman v. British Leyland Motors, Ltd.*,
   601 F.2d 429 (9th Cir.1979) ...........................................................................11

*Soremekun v. Thrifty Payless, Inc.*,
   509 F.3d 978 (9th Cir. 2007) ............................................................................8

*Soranno's Gasco, Inc. v. Morgan*,
   874 F.2d 1310 (9th Cir. 1989) .......................................................................10

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997)............................................................................................17

*Stemmelin v. Matterport, Inc.*,
   No. C 20-04168 WHA, 2022 WL 3226973 (N.D. Cal. Aug. 10, 2022) ...........14, 15

*Von Brimer v. Whirlpool Corp.*,
   536 F.2d 838 (9th Cir.1976) ...........................................................................11

**<u>Statutes, Regulations, and Rules</u>**

Fed. R. Civ. P. Rule 23(c)(4) .............................................................................7

Fed. R. Civ. P. Rule 56 ......................................................................................7

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Matterport promoted its Matterport Service Partner ("MSP") program to individuals with promises of "YOUR BUSINESS, YOUR WAY" and "Be your own boss, set your own hours, and earn what you want. For only $4,100* in up-front investment and minimal training, you'll be on your way to a lucrative, self-owned business." *See* Dkt. 58, Second Amended Class Action Complaint ("SAC"). Matterport promised to MSPs that it would provide filtered leads and additional support and services. *See*, *e.g.*, SAC, ¶¶ 31, 34.

Plaintiff Shawn Lynch ("Lynch" or "Plaintiff") relied on Matterport's promises of a lucrative business opportunity through its Matterport Service Partner ("MSP") program. Plaintiff applied online to become an MSP, fulfilled the requirements to become an MSP, agreed to the terms of service of the MSP program, and became an MSP. Contrary to Matterport's arguments, the evidence supports that Plaintiff became an MSP, not his company, I.C. Progress, Inc. ("I.C. Progress"). At the very least, there is a genuine issue of material fact regarding who was the MSP, as Matterport's own corporate witness could not tell from the MSP application fields which field indicates the name of the MSP. Further, Matterport was targeting *individuals*, such as Plaintiff, for the MSP program with promises that they could be their *own* boss and have their *own* business.

Plaintiff suffered injuries from Matterport's competing with him by selling cameras to potential leads and taking scanning business through its Capture Services program. This conduct was in breach of the implied covenant of good faith and fair dealing in the MSP contract. Matterport took one of Plaintiff's best clients, Cushman & Wakefield ("C&W"), and Plaintiff lost income from losing C&W as a client. This conduct caused injury to Plaintiff separate and apart from the injury suffered by I.C. Progress.

The injunctive relief requested for Defendant's breach of the implied covenant of good faith and fair dealing would not, on its face, violate the Sherman Act. A jury will be required to perform a fact-intensive inquiry in order to determine the antitrust implications of such relief. Plaintiff's breach of the

implied covenant of good faith and fair dealing is not barred by the Sherman Act as a matter of law, and summary judgment is inappropriate.

Plaintiff withdraws his claims for violations of California's Seller Assisted Marketing Plan Act ("SAMP Act"), Unfair Competition Law ("UCL"), and False Advertising Law ("FAL").

## II.   STATEMENT OF ISSUES TO BE DECIDED

- Whether Plaintiff individually suffered injury and has standing for his breach of the implied covenant of good faith and fair dealing claims.

- Whether there is a genuine issue of fact as to whether Plaintiff or I.C. Progress, is the MSP and has a contract with Matterport.

- Whether Plaintiff, not I.C. Progress, suffered damages from Matterport's breach of the implied covenant of good faith and fair dealing.

- Whether Plaintiff's claim for breach of the implied covenant of good faith and fair dealing based on Matterport's operation of its Capture Services program is barred, as a matter of law, by the Sherman Act.

## III.   SUMMARY OF FACTUAL ALLEGATIONS

### A.   Plaintiff Shawn Lynch is the MSP, not I.C. Progress

I.C. Progress is the company that Plaintiff created through which Plaintiff provides photography, video, and 3D documentation services. *See* Dkt. 25-1, Lynch Decl., ¶3.  I.C. Progress is an S-corporation organized under New York law. *Id.*, ¶4. Plaintiff is, and has been since the company was incorporated, the sole shareholder, sole director, and sole employee of I.C. Progress. *Id.*, ¶5.

Plaintiff applied through Matterport's website to become an MSP. *See* Deposition of Shawn Lynch taken June 8, 2023 ("Lynch Dep. II"), marked as **Trial Exhibit 170**, at 34:11-35:8. One of the required fields

of information to apply to become an MSP was a business name. *Id.*, at 35:9-15. Lynch understands himself to be an MSP and not his business. *Id.*, at 35:16-24.

Daniel Fellars testified as the corporate representative of Matterport regarding, *inter alia*, Plaintiff's MSP application and whether Lynch or IC Progess is the MSP, and how Matterport signed up MSPs and identified the MSP on an account. *See* Fellar's <u>Deposition Exhibit 156</u> (Amended Notice of Deposition Pursuant to Federal Rule of Civil Procedure 30(B)(6)), marked as **Trial Exhibit 172**; *see also* Deposition Transcript of Daniel Fellars dated June 13, 2023 ("Fellars Dep."), marked as **Trial Exhibit 171**, at 4:7-5:3. The deposition notice requested that the corporate witness bring Lynch's completed MSP application to the deposition. *See* **Trial Exhibit 172**; *see also* Fellars Dep. 5:4-13. Fellars stated there is no paper application to produce, only a "digital transferal of that application which I've been able to identify to the best of my ability." Fellars Dep. 5:7-13. Fellars produced the information Matterport believes was contained within Plaintiff's MSP application, which was in the form of 26 pages of raw HTML code. Fellars Dep. 5:11-13; 6:5-10, 6:23-7:6; 7:14-19; 8:10-14, 19:7-24. The HTML code in **Trial Exhibit 173** matches the screen shot of the MSP Apply Today page that is marked as Plaintiff's **Trial Exhibit 33**. Fellars Dep. 9:13-10:4. This shows what Plaintiff would have seen when he applied to become an MSP. Fellars Dep. 10:5-8; 11:11-18.

The first heading in the HTML code is "Become a Matterport Service Partner." Fellars Dep. 8:4-9. Underneath the first heading, it states: "Let's capture the world, together. Whether you're an experienced photographer or an entrepreneur looking for a new venture, let us help you build a business using Matterport's industry-leading 3D technology." *See* **Trial Exhibit 173**, at p. 1 (HTML code omitted for ease of reading).

The second heading in the HTML code is "Enrollment Requirements." Fellars Dep. 8:4-9. The Enrollment requirements include that the applicant should own a Matterport Pro or Pro2 3D camera and Cloud Service Plan; complete at least one high-quality 3D scan; have a business name, email address, and website; must currently offer, or intend to offer, Matterport 3D scanning as a service; and the business must not be affiliated with a brokerage or real estate company to be eligible for the program. *See* **Trial Exhibit**

3

**173**, p. 2. The MSP applicant was required to upload a representative sample of his work so that Matterport could take a look at it and make sure the applicant knows what he is doing. Fellars Dep.27:2-6.

On page 2 of **Trial Exhibit 173**, within the HTML code, the form is identified as "Matterport Service Partner Program Application." Fellars Dep. 12:10-13. The first question on the MSP application asked how Matterport should get in touch with the applicant, and it asked for first name, last name, email address, title (optional), and phone number. Fellars Dep. 13:3-12. The MSP application then asked for the four-digit alphanumeric code at the bottom of the camera (also known as the camera serial number), which was a required field. Fellars Dep. 13:13-17. Next, the MSP application provides a field for the applicant to add an example 3D space, which is a required field. Id., 13:16-17. The MSP application then asks the distance the applicant is willing to travel from his business to scan a space, and it has a dropdown box with four option values. *Id.*, 13:18-21. Next, the MSP application asks for a company name, which is a required field. *Id.,* 13:22-14:1. The application then asks for the company address. *Id.,* 13:22-14:6. Finally, the application asks the applicant to agree to the service partner terms (which are provided by hyperlink to the "MSP Terms of Service") by checking a box, and then ends with a submit application button. *Id.,* 13:7-15, 15:7-16:6. Next to the checkbox asking if the applicant agrees to the terms of the MSP, there is no contact name or company name. *Id.*, 30:22-31:24.

Fellar's Deposition Exhibit 158, marked as **Trial Exhibit 174**, provides some data that Plaintiff inputted into the MSP application that was then inputted into Salesforce, which is the customer relationship management platform used by Matterport.. *Id.,* 20:1-22:5. Fellars could only speculate as to which field in the MSP Application goes into which field in Salesforce. *Id.,* 23:6-22. In the MSP Application (**Trial Exhibit 173**), the first question asks how Matterport should get in touch with the applicant and provides fields for first and last name, which Fellars believes would have been put into Salesforce (**Trial Exhibit 174**) as the MSP contact name. *Id.,* 23:11-24:8. The Salesforce record includes the MSP email, which is shawn@icprogressphotos.com, and the applicant's title, which is listed as President. *Id.,* 24:9-11, 26:7-9.

4

Matterport organized its Salesforce data in a hierarchical structure so that the account name, which is the name of the individual's business, is at the top of the hierarchy and the MSP contact information and other data sits under the account name. *Id.*, 33:19-36:17.

Significantly, Matterport's corporate representative agreed that every account is going to have a business name and he could not say whether Plaintiff is the MSP or whether I.C. Progress is the MSP. *Id.*, 37:1-38:1.

**B.      Matterport Undermined its Own MSPs in Breach of the Implied Covenant of Good Faith and Fair Dealing**

Despite promising to support MSPs, Matterport decided to get into the scanning business and compete with MSPs for scanning business using information that it learned from its MSPs. "Lion" was a pilot program that Matterport launched in San Francisco in July 2017, as Matterport was going to get into the scanning business. Johnson Dep. 78:15-79:10; Wilson Dep., 24:12-17; Chen Dep. 32:15-16, 33:16-34:9. "Lion" was the precursor to the Capture Services program that was announced in the Spring 2020. Johnson Dep. 83:13-17; Fellars Dep. 20:1-2. Matterport quickly announced it was withdrawing the pilot program due to backlash from MSPs complaining that Matterport would be directly competing with them if the "lion" program continued. Johnson Dep. 79:11-24, 79:25-80:4; Wilson Dep., 24:20-23; Itskovitz Dep. 54:23-55:16.

However, Matterport surreptitiously continued to operate the program as part of a business model designed to compete against MSPs. Matterport continued to operate the "lion" program surreptitiously while Matterport continued to enroll people into the MSP program from July 2017 until Dolores Johnson ("Johnson") left Matterport on September 15, 2019, but Matterport was not telling the prospective MSPs, including Plaintiff, about it when Matterport was enrolling them into the MSP program. Johnson Dep. 81:11-24, 84:4-13. Wilson told Johnson that it was not something that was public, and to keep it "hush hush." Johnson Dep. 81:25-83:12. Johnson told her manager that "lion" was a conflict of interest with

MSPs and her manager did nothing, and Wilson told her not to talk about it. Johnson Dep. 84:19-85:21.

Additionally, in or about February 2019, Matterport surveyed MSPs about what they charged for their scanning services. Matterport then used that information to devise pricing for Matterport Capture Services to the detriment of MSPs, so that Matterport could undercut MSPs' pricing and steal the MSPs' customers. SAC, ¶ 70; *see also* Dkt. 64-2, Plaintiff's Compendium of Facts and Citations to Evidence in Support of Class Certification, at ¶¶ 63, 67.

Matterport promotes "Matterport Capture Services" on its website and states "Let us capture for you." *See* SAC, ¶ 72 (citing https://matterport.com/capture-services). Matterport set the pricing for Capture Service technicians' scans, and Matterport requires that a Capture Services customer purchase a subscription plan—such as a Starter, Professional, or Business plan—or contact Matterport for custom enterprise plans. *Id.*

After Capture Services was announced, numerous MSPs complained that instead of helping them grow their business as Matterport promised, Matterport developed the Capture Services program and was competing against MSPs by undercutting MSPs' prices. MSPs complained that they lost customers who hired Capture Services technicians instead of MSPs, and that Matterport's Capture Services plans prohibited MSPs' clients from selecting and continuing to do business with their existing MSPs. Dkt. 66-4 (**Trial Exhibit 59**), Dkt. 66-5 (**Trial Exhibit 61**); SAC, ¶¶ 73, 77, 113, 114.

Matterport is no longer promoting the use of MSPs and, instead, is promoting Capture Services. Matterport's current "Find a Matterport Service Partner" webpage promotes Capture Services over the MSP program and includes the statement, "…aren't ready to invest in a camera? Try out Matterport's Capture Services. … If your city isn't in the network, you can check whether there's a Matterport Service partner (MSP) in your local area to scan the property for you." *See* https://support.matterport.com/s/article/Find-a-Matterport-Service-Partner?language=en_US (last accessed Feb. 15, 2023). SAC, ¶ 108. Matterport's current webpage does not promote MSPs and, instead,

includes the statement, "And if you'd rather have someone else do the scanning, we can take care of it for you with Matterport Capture Services." *See* https://matterport.com/cameras (last accessed Feb. 15, 2023). SAC, ¶ 109. Matterport promotes Capture Services and does not mention MSPs. *Id.*

After the Capture Services program was announced, the number of leads that Plaintiff received dropped to two in 2021, and one of those leads was blank. Plaintiff received no leads in 2022. SAC, ¶ 89.

Plaintiff lost one of his best clients—C&W—to Matterport Capture Services. C&W provided approximately 13% of Lynch's company's revenue for 2020, and approximately 26% of Lynch's company's revenue for 2021. SAC, ¶ 93. In or around January 2022, C&W notified Lynch that they signed up with Matterport Capture Services and would no longer need his services. Lynch lost business as a direct result of Matterport competing against him with its Capture Services program. SAC, ¶ 94.

C&W entered into an exclusive agreement with Matterport that requires the use of Matterport Capture Services technicians. Thus, C&W is not given the choice of using an MSP even though C&W was satisfied with Plaintiff's services.

### C.    Certification of a Rule 23(c)(4) issue Class

The court certified a Rule 23(c)(4) issue class on a single question:

> This order thus defines the following class: All enrolled MSPs when Matterport launched its Capture Services program. The following issue is certified for class treatment: Whether or not the MSP terms of service prevent a claim for breach of the implied covenant of good faith and fair dealing based on Matterport's operation of its Capture Services program. If the legal answer is "yes," then that will be the end of the implied covenant claim for all.

*See* August 16, 2023 Order Re Plaintiff's Motion for Class Certification, at p. 13.

## IV.    LEGAL STANDARD

Summary judgment is proper only upon a showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Material" for purposes of Rule 56, means that the fact, under governing substantive law, could affect the outcome of

the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to be "genuine," a reasonable trier of fact must be able to return a verdict for the nonmoving party. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (citing *Anderson*, 477 U.S. at 248). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). Summary judgment must be denied if, when "viewing the evidence in the light most favorable to the non-moving party," there are genuine issues of material fact. Fed. R. Civ. P. 56(c); *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009).

## V.   ARGUMENT

### A.   Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

"The law implies in every contract . . . a covenant of good faith and fair dealing. 'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits....'" *Ghazarian v. Magellan Health, Inc.*, 53 Cal. App. 5th 171, 183 (2020), *as modified on denial of reh'g* (Aug. 31, 2020), *review denied* (Nov. 10, 2020) (citation omitted). Allegations of *omissions* can be the basis for a breach of the covenant of good faith and fair dealing. *See Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 904 F.3d 821, 833 (9th Cir. 2018). "The essence of the good faith covenant is objectively reasonable conduct." *Lazar v. Hertz Corp.*, 143 Cal. App. 3d 128, 141 (1983). Plaintiff's actual reliance is not an element of the claim. *Id.*

Matterport promised certain MSP program benefits to help MSPs—such as Plaintiff and Class members—be successful. The terms and conditions of the MSP program mention that MSPs would be given leads and marketing assistance, and the necessary implication is that Matterport will not directly compete with MSPs for these potential leads, withhold these leads from MSPs, and conceal that conduct from MSPs. Matterport made omissions of material facts, and unfairly frustrated the purpose of their

8

agreement by directly competing with MSPs. *See* SAC, ¶¶ 64-77. Matterport promised in bad faith to facilitate MSPs' business expansion by providing MSPs with pre-qualified leads, while at the same time Matterport was directly competing against MSPs for these leads—conduct that it concealed from prospective MSPs when it enrolled them into the MSP program. SAC ¶¶ 6-7, 11-13, 53-59, 64-77. This conduct is objectively unreasonable. SAC ¶ 156.

**B.    Plaintiff Has Standing for His Breach of Implied Covenant of Good Faith and Fair Dealing Claim**

With regard to his claim for Breach of Implied Covenant of Good Faith and Fair Dealing, Plaintiff has sought actual damages, including lost profits for the loss of his client, C&W, to Matterport Capture Services, punitive damages and injunctive relief. *See*, *e.g.*, SAC, ¶¶ 14, 95, 162, and Prayer for Relief. Contract damages seek to approximate the agreed-upon performance. "[I]n the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance."' *Copenbarger v. Morris Cerullo World Evangelism, Inc.*, 29 Cal.App.5th 1, 9 (2018) (internal citations omitted). A jury could find that Matterport's conduct constituted a breach of the implied covenant of good faith and fair dealing and award lost profits to Plaintiff. *Hewlett-Packard Co. v. Oracle Corp.*, 65 Cal. App. 5th 506, 555, 280 Cal. Rptr. 3d 21, 63 (2021), *reh'g denied* (July 8, 2021), review denied (Sept. 29, 2021), cert. denied, 142 S. Ct. 2709 (2022) (finding that Oracle's decision to stop porting activities, and its subsequent conduct, could properly serve as the basis for the jury to consider breach of the implied covenant as "contrary to the contract's purposes and the parties' legitimate expectations," and upholding jury's damages award of $3.014 billion for HP's lost profits).

Defendant argues that Plaintiff does not have standing because any injury suffered was allegedly incurred by I.C. Progress and not Plaintiff personally. *See* Dkt. 89, Defendant Matterport, Inc.'s Motion for Summary Judgment ("MSJ"), pp. 6-8. Defendant raised this standing argument in its motion to dismiss. The Court previously rejected Defendant's argument. *See* Dkt. 34, Order Re Defendants' Motion to

Dismiss, at p. 12.

Plaintiff has suffered a direct and independent injury from Matterport's fraudulent inducement to become and MSP, which is separate from any injury to I.C. Progress. As the Ninth Circuit has explained:

> The fact that these injuries arose from the same conduct as the corporate injuries does not preclude a finding of direct and independent injury to individual plaintiffs for standing purposes. This circuit has held that the same conduct can result in both corporate and individual injuries. *Gomez v. Alexian Bros. Hosp.,* 698 F.2d 1019, 1021 (9th Cir. 1983); *Marshall v. Kleppe,* 637 F.2d 1217, 1222 (9th Cir. 1980).

*Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1319 (9th Cir. 1989).

Defendant's conduct induced Plaintiff to become an MSP, and Defendant's conduct also caused him to lose personal income. Defendant's conduct caused I.C. Progress to lose income, but because it is an S-corporation, that "loss of income" flows directly to Plaintiff via a Schedule K-1. For example, if I.C. Progress had not lost C&W as a customer, I.C. Progress would have had more revenue, and Plaintiff would have had that exact amount of revenue on his personal tax return via a Schedule K-1 from I.C. Progress. Thus, Plaintiff has suffered a direct injury as a result of the loss of business from competition by Capture Services.

Plaintiff's expert, Phillip Allman, has a Ph.D. in economics and has testified in over 800 trials and arbitrations involving the valuation of economic damages. *See* Dkt. 85-1, Report of Plaintiff's Economic Expert, at ¶ 2. Dr. Allman has calculated the economic loss to Plaintiff from Matterport Capture Services competing against him and taking his client, C&W.[1] Dr. Allman states "[t]he present discounted value of Mr. Lynch's economic loss given two future years of lost sales equals $190,479; given five future years of lost sales equals $311,416; and given ten years of lost sales equals $506,066." *See* Report of Plaintiff's

---

[1] Defendant's expert, Brian Ellman, did not perform a calculation of Plaintiff's economic loss, but rather, provided an analysis based on Plaintiff being returned to the economic position he would have been in had he never having pursued an MSP business. Plaintiff intends to move to bar Mr. Ellman's testimony at trial, as Mr. Ellman rendered no opinions on Plaintiff's lost sales from C&W.

Economic Expert, at ¶ 3. The trier of fact will determine whether Matterport breached the implied covenant and, if yes, the number of years of future lost profits that should be awarded.

Matterport's focus on the payments for the camera and Matterport Cloud Services is misplaced. Whether the camera and Cloud services were paid by I.C. Progress or Plaintiff is of no significance because Plaintiff is not seeking those costs as damages for breach of the implied covenant of good faith and fair dealing. Plaintiff is only seeking lost sales from the loss of C&W as damages.

Defendant's authority is distinguishable because they stand for the proposition that a sole-shareholder of company cannot recover damages suffered by the corporation. *See Lee v. U.S. Taekwondo Union*, No. 04-00461 SOM-LEK, 2006 WL 319219, at *3 (D. Haw. Feb. 10, 2006) (distinguishing *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 439–40 (9th Cir.1979) (an action for an injury to the corporation must be brought by the corporation)); *Von Brimer v. Whirlpool Corp.,* 536 F.2d 838, 846 (9th Cir.1976) (noting that, under California law, a shareholder may not maintain an action for wrongs suffered by a corporation on the theory that such wrong devalued his stock and the stock of other shareholders); *Erlich v. Glasner,* 418 F.2d 226, 228 (9th Cir.1969) (same). Because Plaintiff is not seeking to personally recover damages for any injury suffered by I.C. Progress, such as the costs for the camera or Cloud Services, the cases relied on by Matterport are distinguishable. Thus, Plaintiff has standing.

## C.   Plaintiff is a Party to the MSP Contract with Matterport

Plaintiff is a party to the MSP contract with Matterport. Plaintiff complied with all the requirements to become an MSP and agreed to the Matterport Service Partner Program Terms and Conditions. *See* Section III.A, *supra*.

After reviewing Defendant's representations about the MSP program, Plaintiff applied to be an MSP.  SAC, ¶82; *see* Dkt. 25-1, Lynch Declaration in Support of Plaintiff's Response in Opposition to Defendants' Motion to Dismiss Plaintiff Shawn Lynch's Amended Class Action Complaint for Damages

("Lynch Decl."), ¶2; *see also* Lynch Dep. II, **Trial Exhibit 170**, at 34:12-35:8 ("I applied to be the MSP myself.").

Defendant argues that Plaintiff is not a party to a contract with Matterport because "he personally neither purchased the Matterport camera or the Cloud services plan, nor signed up to be a MSP." MSJ, p. 9. However, Defendant admits that Plaintiff purchased a Matterport camera. *See* Dkt. 61, Defendant's Answer to Plaintiff's Second Amended Complaint, ¶ 83 ("Answering paragraph 83 of the SAC, Matterport admits Plaintiff purchased a Matterport Pro2 3D camera on March 28, 2018."). In any event, the purchase of a Matterport camera and Cloud services by the applicant was not a requirement of the MSP program. Further, *Lynch* applied to be an MSP, fulfilled the requirements to become an MSP, and accepted the terms of the MSP program.

The MSP Application provided that "the applicant should **own** a Matterport Pro or Pro2 3D camera and Cloud Service Plan." *See* **Trial Exhibit 173**, p. 2 (emphasis added); *see also* **Trial Exhibit 145**, Matterport's Response to Interrogatory No. 4 ("To become an MSP one would need to fill out an application; **own** a suitable Matterport camera, a suitable IOS device that can link to the camera and upload to a Matterport cloud account; and a Matterport Cloud Service Plan; and offer or intend to offer Matterport 3D scanning as a service.") (emphasis added). There is no requirement that, to become an MSP, the applicant had to personally purchase the 3D camera and Cloud Service Plan.

The MSP program Application required that Plaintiff provide the four-digit alphanumeric code for his 3D camera, which he entered and is recorded in Salesforce as camera serial No. U970. Fellars Dep., 26:14-17. Plaintiff also uploaded a representative sample of his work so that Matterport could see that he could complete a high-quality 3D scan. *Id.*, 26:18-27:6.

Plaintiff complied with the requirements to become an MSP. The Enrollment requirements include that the applicant should own a Matterport Pro or Pro2 3D camera and Cloud Service Plan; complete at least one high-quality 3D scan; have a business name, email address, and website; must currently offer,

or intend to offer, Matterport 3D scanning as a service; and the business must not be affiliated with a brokerage or real estate company to be eligible for the program.  *See* **Trial Exhibit 173**, p. 2. The MSP applicant was required to upload a representative sample of his work so that Matterport could take a look at it and make sure the applicant knew what he is doing. Fellars Dep.27:2-6. Plaintiff submitted a 3D scan that he himself scanned to demonstrate that he was able to do the work of an MSP. *Id.*

When Plaintiff applied online to be an MSP, Plaintiff was required to enter the name of his company. Lynch Decl., ¶2; Lynch Dep. II, 35:9-35:24. The MSP Program Terms and Conditions provided that applicants submit business information to Matterport. *See* Dkt. 70-7, Defendant's Exhibit 214 to its Opposition to Plaintiff's Motion for Class Certification, at Section 2 - Requirements for Participation in Program; Ongoing Review. Therefore, Plaintiff submitted the name of his company, I.C. Progress, as part of *his* MSP application. The submission of the name of his company on his application as required did not change the fact that Plaintiff was personally applying to be an MSP.

Plaintiff being the MSP comports with Defendant's marketing and advertising that promoted its MSP program as a way for individuals to "be your own boss" and create a "lucrative, self-owned business." SAC, ¶ 36.

### D.    Plaintiff has Suffered Actual Damages

Plaintiff alleges damages to himself individually from Matterport's breach of the implied covenant of good faith and fair dealing. Plaintiff alleges lost profits from the loss of his client, C&W, to Matterport Capture Services. SAC, ¶¶ 93-94; *see also Hewlett-Packard Co.*, 65 Cal. App. 5th 506, 555 (awarding lost profits for breach of the implied covenant of good faith and fair dealing).

As explained above, because Plaintiff is the sole shareholder, sole director, and sole employee of an S-corporation, the exact amount of revenue of I.C. Progress is reported on Plaintiff's personal tax return via a Schedule K-1. If I.C. Progress had not lost C&W as a customer, I.C. Progress would have had more revenue, which would have been reflected on Plaintiff's personal tax return. Thus, Plaintiff has suffered a

direct injury as a result of the loss of business from competition by Capture Services.

As explained above, Plaintiff's expert, Dr. Allman, has calculated the economic loss to Plaintiff from Matterport Capture Services competing against him and taking his client, C&W. *See* Dkt. 85-1, Report of Plaintiff's Economic Expert at ¶ 2.

Plaintiff also seeks injunctive relief regarding Matterport's Capture Services program.[2] SAC, p. 35, Prayer for Relief, subparagraph g (providing alternative injunctive relief regarding Matterport competing against its own MSPs). The specific injunctive relief can be fashioned later in this litigation. *See, e.g., Adkins v. Facebook, Inc.,* 424 F. Supp. 3d 686, 698-99 (N.D. Cal. 2019) (citing *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (finding the plaintiff is not required at the class certification stage to specify the precise injunctive relief he will ultimately seek).

Matterport argues that Plaintiff cannot show actual damage from any breach of the implied covenant of good faith and fair dealing because I.C. Progress's income from Matterport-related goods and services increased from 2021 to 2022. MSJ, p. 10. Matterport cites no authority for its argument that where a plaintiff has "mitigated and worked for other clients that led to an increase in its revenue and profits" (MSJ, P. 10), that a plaintiff cannot seek lost profits from a breach of the implied covenant of good faith and fair dealing that resulted in the loss of an existing client. Matterport's argument should be rejected.

**E.    Plaintiff's Breach of Implied Covenant of Good Faith and Fair Dealing Claim is Not Barred, as a Matter of Law, by the Sherman Act**

The terms and conditions of the MSP program mention that MSPs would be given leads and marketing assistance, and the necessary implication is that Matterport will not directly compete with

---

[2] In *Stemmelin*, the Court noted that "Matterport does not contest that it continues to operate its capture services, its in-house service that performs ostensibly the same function as MSPs." *See Stemmelin v. Matterport, Inc.*, No. C 20-04168 WHA, 2022 WL 3226973, at *4 (N.D. Cal. Aug. 10, 2022). The Court found that "Stemmelin has Article III standing to seek an injunction prohibiting Matterport from competing against MSPs for 3D scanning business." *Id.*

MSPs for these potential leads, withhold these leads from MSPs, and conceal that conduct from MSPs. Matterport made omissions of material facts, and unfairly frustrated the purpose of their agreement by directly competing with MSPs. *See* SAC, ¶¶ 64-77. Matterport promised in bad faith to facilitate MSPs' business expansion by providing MSPs with pre-qualified leads, while at the same time Matterport was directly competing against MSPs for these leads—conduct that it concealed from prospective MSPs when it enrolled them into the MSP program. SAC ¶¶ 6-7, 11-13, 53-59, 64-77. This conduct is objectively unreasonable. SAC ¶ 156.

Matterport argues that the MSP Terms and Conditions disclaim any promise of an increase of business or revenue, that the Capture Services program benefits MSPs, and that Plaintiff seeks to modify the contract to add a non-compete provision in violation of the Sherman Act. MSJ, pp. 11-12.

In *Stemmelin*, the Court denied a motion for summary judgment on a breach of implied covenant of good faith and fair dealing claim because Matterport's "no-warranty provision [was] not coextensive with the conduct Stemmelin asserted violates the implied covenant." *Stemmelin v. Matterport, Inc.*, No. C 20-04168 WHA, 2022 WL 3226973, at *5 (N.D. Cal. Aug. 10, 2022). "When a contract does not expressly permit certain conduct, '[d]ifficulty arises in deciding whether such conduct, though not prohibited, is nevertheless contrary to the contract's purposes and the parties' legitimate expectations.'" *Id.* (citing *Avidity Partners, LLC v. California*, 221 Cal. App. 4th 1180, 1204 (2013)). The same reasoning compels denial of summary judgment here, because the no-warranty provision does not expressly permit Matterport's competition with MSPs, and MSPs' legitimate expectation was that they would not face competition from Matterport for scanning jobs.

Matterport also argues that MSPs benefit from the Capture Services program because it allegedly creates more demand for MSP services in general, both nationally and locally. MSJ, p. 12. In reality though, Matterport is generating more demand for *Capture Services technicians*, and the majority of MSPs

1   are *not* also Capture Services technicians.[3]

2       In fact, Matterport Capture Services is unnecessary. One of Matterport's MSP declarants, Dustin

3   Gardner, testified that he "has developed a private network of approximately 140 of Matterport camera

4   owners many of whom are also MSP members. . . .Our network is currently handling a job consisting of

5   1,400 scans nationwide for a big box store and our gross receivable are in the seven-figures." Dkt. 70-16,

6   Gardner Decl. ¶9. While Matterport argues that Capture Services benefits the MSPs, it ignores that without

7   the injunctive relief that Lynch seeks, Matterport can enter into a Capture Services agreement with

8   Gardner's "big box store" customer[4] and take away the seven-figures of scanning work from these MSPs.

9   Lynch seeks injunctive relief so that the Capture Services program cannot take clients away from MSPs.

10      Lastly, an injunction against Matterport to prevent it form competing against MSPs does not

11  violate the Sherman Act, as a matter of law. In general, cases involving the Sherman Act relate to

12  restrictions upon competition that fall within two distinct categories: (1) horizontal restrictions, which

13  affect competition at the same level of a supply chain, such as price-fixing agreements between two

14  competing retailers of the same product; and (2) vertical restrictions, which affect conduct at different

15  levels of a supply chain, such as where a manufacturer sets a minimum price at which retailers may sell a

16  particular product. *See, e.g.*, *Frame-Wilson v. Amazon.com, Inc.*, 591 F.Supp.3d 975, 986 (W.D. Wash.

17  2022) (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015))

18  (discussing the difference between horizontal and vertical restrictions).

---

[3] There are 2,647 MSPs, 144 Capture Services technicians, and only 107 of those Capture Services technicians are also MSPs. *See* **Trial Exhibits 163, 165, 166** (Dkts. 72-9, 72-11, 72-12).

[4] Notably, Gardner does not state the "big box store" customer by name, perhaps to prevent Capture Services from stealing it as a customer.

As courts have frequently observed, horizontal restrictions are "inherently anticompetitive." *E.g.*, *In re Musical Instruments*, 798 F.3d at 1191. Accordingly, horizontal restrictions are *per se* illegal under the Sherman Act. *Id*.

Vertical restrictions, in contrast, are subject to the less-stringent "rule of reason" analysis, under which "courts examine 'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed,' to determine the effect on competition in the relevant product market." *Frame-Wilson*, 591 F.Supp.3d at 986 (quoting *In re Musical Instruments*, 798 F.3d at 1191-92). This is because, as courts have repeatedly noted, vertical restrictions "may have procompetitive justifications that benefit consumers." *In re Musical Instruments*, 798 F.3d at 1191 (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-92 (2007)).

For example, although vertical restrictions setting minimum prices at which retailers may sell a given product may "eliminate intrabrand price competition" between retailers of that particular product, this lack of price competition encourages retailers to differentiate themselves in other ways and "invest in tangible or intangible services" that results in a net benefit for consumers. *E.g.*, *Leegin*, 551 U.S. at 890-92. In addition, vertical restrictions "can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product—by reducing intrabrand competition—the competition among retailers selling the same brand," which is also a boon to consumers. *E.g.*, *Leegin*, 551 U.S. at 890-92 (discussing the ways in which reduced intrabrand competition, and increased interbrand competition, benefit consumers). Indeed, "the primary purpose of the antitrust laws is to protect interbrand competition," even when it comes at the expense of intrabrand competition. *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997); *Leegin*, 551 U.S. at 890; *see also*, *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1015 (9th Cir. 1983) ("While vertical restrictions reduce[] intrabrand competition, they ha[ve] redeeming virtues in that they tend[] to promote interbrand competition.")

17

One common category of vertical restrictions are exclusivity agreements, such as where a manufacturer grants a distributor the right to be the exclusive supplier of a given product to all retailers in a certain territory, or where a manufacturer limits the number of retailers that may sell a particular product in a geographic area. *See, e.g.*, *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 721 (1988); *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 38 (1977). Since these types of exclusivity "arrangements have recognized economic benefits and pro-competitive effects and generally pose little threat to competition," they are typically permissible, and only violate [the Sherman Act] when used by a dominant supplier of a product or service to unreasonably deprive other suppliers of a market." *E.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 4 F.Supp.3d 1123, 1135 (D. Ariz. 2014) (*aff'd*, 836 F.3d 1171 (9th Cir. 2016)); *Sylvania*, 433 U.S. at 59; *see also*, *JBL Enterprises*, 698 F.2d at 1015 (noting that "generally, manufacturers are free to impose vertical territorial restrictions"); *Leegin*, 551 U.S. at 903 ("A manufacturer can impose territorial restrictions on distributors and allow only one distributor to sell its goods in a given region.").

Here, although the injunctive relief requested by Plaintiff would (somewhat) limit Matterport's ability to participate as a retailer in the market for 3D scanning services by preventing it from competing against MSPs[5], it would be functionally no different from a vertical exclusivity restriction, which is typically deemed permissible. *See, e.g.*, *JBL Enterprises*, 698 F.2d at 1015; *Leegin*, 551 U.S. at 903. This is particularly true given that the injunctive relief requested herein would only limit Matterport's ability to *directly* compete with MSPs, as opposed to completely barring Matterport from the relevant marketplace.

---

[5] Not every 3D camera owner is an MSP, so even if the injunctive relief were granted, Matterport could still compete in the market for scanning services.

18

Moreover, as noted above, any harms associated in the reduction in *intrabrand* competition for Matterport's 3D scanning services would likely be outweighed by the benefits of increased *interbrand* competition for 3D scanning services at large. *See, e.g.*, *Leegin*, 551 U.S. at 890-92. In other words, there is no reason to believe that the injunctive relief requested herein is categorically bad; it very well could (and likely would) be beneficial to consumers.

Finally, even to the extent that the requested injunctive relief would have horizontal effects—by eliminating a competitor in the marketplace for 3D scanning services—it would still be categorized as a vertical restriction. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1480-81 (9th Cir. 1986) (noting that "restrictions imposed in the context of dual distributorships"—*i.e.*, where "a manufacturer operates at two distinct levels of the distribution chain in the same market by acting as both a supplier and a distributor of its own products"—are vertical restrictions "and analyzed[] under the rule of reason"). Indeed, it is well-settled that "a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement," which would *not* be the case here. *See, e.g.*, *PowerTV Media, LLC v. St. Racing DigNight, LLC*, 2017 WL 5665013, at *8 (C.D. Cal. 2017) (quoting *Sharp*, 485 U.S. at 730, n. 4).

In sum, while the injunctive relief requested in this case[6] may implicate the Sherman Act, it would not clearly violate it. As such, a jury will be required to engage in the fact-intensive rule of reason analysis to determine whether, on balance, the requested injunctive relief would be permitted under the Sherman Act.[7] *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1386 (9th Cir.

---

[6] The Court can fashion the appropriate remedy and injunctive relief later, after the fact-intensive inquiry under the Sherman Act. At a minimum, the injunction should prohibit Matterport from trying to steal away the MSPs' existing clients, which may require that MSPs identify their existing clients to Matterport to the extent Matterport does not already know who their existing clients are.

[7] In performing this analysis, it may also be helpful to allow the jury to consider the anti-competitive implications of Matterport's ability to first set, and then undercut, the market for its 3D scanning services. Specifically, Matterport—as the supplier of the 3D cameras and Cloud Service Plans that must be

1984) (rule of reason analysis conducted by jury). Thus, given these issues, Matterport's motion for summary judgment should be denied.

## VI.    CONCLUSION.

For the foregoing reasons, Plaintiff asks the Court to deny Matterport's Motion for Summary Judgment.

Respectfully submitted,

Dated: October 19, 2023          By: */s/ Thomas A. Zimmerman, Jr.*
                                           Thomas A. Zimmerman, Jr.

---

purchased to in order join the MSP program—controlled the costs of MSPs' entry into the marketplace for 3D scanning services, which, in turn, increased the minimum prices that MSPs could charge their customers (if they wanted to recoup their investments). **Trial Exhibits 27, 28, 33** (Dkts. 66-1, 66-2, 66-3); Fellars Dep. 40:12-41:8, 43:12-20, 44:14-45:9; Itskovitz Dep. 27:2-8; **Trial Exhibit 156** (Dkt. 66-11), Matterport's Resp. to Req. for Admission No. 20. But then, Matterport entered that same market, in direct competition with its own MSPs, and undercut the very prices that Matterport itself influenced.

# PROOF OF SERVICE

I, Thomas A. Zimmerman, Jr., declare as follows:

I am employed in the County of Cook, State of Illinois.  I am over the age of 18 and not a party to this action.  My business address is 77 West Washington Street, Suite 1220, Chicago, Illinois 60602. October 19, 2023, I instituted service of the following document described as:

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MATTERPORT, INC.'S MOTION FOR SUMMARY JUDGMENT**

on the following parties:

**Counsel for Defendant**

Michael K. Johnson
LEWIS BRISBOIS BISGAARD
 & SMITH LLP
2185 North California Boulevard, Suite 300
Walnut Creek, CA 94596
*Michael.Johnson@lewisbrisbois.com*

Jon P. Kardassakis
Eleonora Antonyan
LEWIS BRISBOIS BISGAARD
 & SMITH LLP
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
*Jon.Kardassakis@lewisbrisbois.com*
*Eleonora.Antonyan@lewisbrisbois.com*

In the following manner as described below:

**[X]**     Submitting an electronic version of the documents via portable document format (PDF)    to the court at https://ecf.cand.uscourts.gov.

Service will be deemed effective as provided for by Civil Local Rule 5-1 of the District Court of California, Northern District.

I certify under penalty of perjury that the foregoing is true and correct.

Executed October 19, 2023, at Chicago, Illinois.

/s Thomas A. Zimmerman, Jr.
Thomas A. Zimmerman, Jr.

21